**UNITED STATES of America,
Plaintiff and Appellee,**

v.

**Rickie A. SCHEIBLAUER, Defendant
and Appellant.**

No. 72–2189.

United States Court of Appeals,
Ninth Circuit.

Jan. 17, 1973.

Frederick F. Cohn (argued), Chicago, Ill., William H. Wise, of Katz, Hirsch & Wise, Ltd., Chicago, Ill., for defendant and appellant.

F. Michael Carroll, Asst. U. S. Atty. (argued), William C. Smitherman, U. S. Atty., Phoenix, Ariz., for plaintiff and appellee.

Before CHAMBERS and TRASK, Circuit Judges, and BYRNE, Sr.,* District Judge.

WILLIAM M. BYRNE, Sr., District Judge:

Scheiblauer appeals from his conviction for both unlawful possession of marihuana with intent to distribute it and smuggling marihuana, violations of 21 U.S.C. § 841(a), § 952(a), and § 960(a)(1) respectively. He challenges the admissibility of the crucial evidence which led to his conviction, namely, 116 pounds of marihuana and his admissions pertaining thereto.

On December 22, 1971, the Tucson, Arizona office of United States Customs received a telephone call from an employee of a local private air service. The caller stated that a man (later identified as Scheiblauer) had chartered a private aircraft to fly him, his female companion, and their luggage to Sky Harbor Airport in Phoenix, Arizona, that their luggage consisted of a large footlocker and two suitcases, that they intended to catch a connecting commercial flight to Chicago that was scheduled to depart from Sky Harbor Airport within a few minutes after they arrived there, and that the man had done the same thing on at least one previous occasion. This informant further stated that the aircraft was already airborne and he furnished a detailed description of the aircraft and its occupants. Immediately after receiving this information, the Tucson office relayed it via radio to Customs agents in Phoenix.

After the Phoenix office received the relayed information, Special Agents Adams and Loughridge were dispatched to Sky Harbor Airport to await the arrival of the chartered aircraft. At that site, they observed the aircraft land, taxi to an American Airlines' loading gate, and disembark passengers and luggage fitting the descriptions which they had received. The male passenger was assisted in unloading the luggage by an airlines' employee to whom he gave custody of it. Thereupon, Agent Adams kept the two passengers under surveillance while Agent Loughridge went to the airlines' operations office to seek further information.

At that office, Agent Loughridge identified himself to a Mr. Femia, the airlines' passenger service supervisor, and a Mr. Moberly, the airlines' employee to whom the male passenger had given custody of the luggage. The agent then asked whether anything unusual had recently occurred. Mr. Moberly answered that a small private aircraft

* Honorable William M. Byrne, Sr., United States Senior District Judge, Central District of California, sitting by designation.

had just arrived at the airlines' loading gate and unloaded two passengers and their luggage. The agent inquired further. Moberly told him that the male passenger had told him that his name was "Johnson", had tipped him $5.00, and had given him custody of his luggage with instructions to place it aboard the flight to Chicago. Moberly also noted that the flight to Chicago had originally been scheduled to depart shortly after the private aircraft had arrived but had been unexpectedly delayed.

Agent Loughridge then stated that there was a possibility that the luggage contained a shipment of narcotics and suggested that it be checked. Femia expressed willingness to cooperate and the three men proceeded to the airlines' baggage area where Moberly pointed out the baggage. Thereupon, the three determined that the luggage was exuding a very strong odor of mothballs. They also noted that the footlocker was locked with a heavy-duty combination lock in addition to its built-in lock.

After this external examination, Femia decided to page "Mr. Johnson" and to have him open his luggage. Agent Loughridge took no part in Femia's decision. Instead, the agent withdrew to a vantage point where he could observe from afar. In the meantime, he briefed Agent Paulsen, a third Customs agent who had just arrived.

Subsequently, Femia's page for "Mr. Johnson" was answered by the male suspect who was still being followed by Agent Adams. After a short conversation at the ticket desk, "Johnson" accompanied Femia to the baggage area. The pair walked directly to the suspicious luggage and "Johnson" identified it as being his. However, when Femia asked him to open it, he abruptly disclaimed ownership. After further discussion, "Johnson" inquired as to whether the police had been notified. When Femia replied in the negative, "Johnson" stated that he was going to board the flight to Chicago without any luggage. Thereafter, "Johnson" left the baggage area. Instead of following "Johnson,"

Agent Adams went up to Femia, identified himself, and asked what had transpired. Femia related the entire conversation.

Thereupon, Agents Adams and Paulsen rendezvoused and exchanged their respective information. They decided to question "Johnson" and his female companion. Therefore, they walked up to the pair who were standing near the ticket desk, identified themselves, and stated that they wanted to ask them some questions. The two suspects willingly accompanied the agents to the main lobby where Agent Paulsen gave them a *Miranda* warning, "Johnson" stated that he understood the warning and was willing to answer questions. When Agent Paulsen asked him what he had inside the luggage, "Johnson" replied, "You know what I have in the bag!" When the agent asked him if he would open it "Johnson" refused to do so. Then, the agent told him that, if necessary, a search warrant for the luggage would be obtained. Shortly thereafter, Agent Loughridge arrived in the main lobby and the three agents escorted their suspects toward the airlines' security office where they intended to question them further.

While enroute to that office, "Johnson" admitted that the luggage contained marihuana and stated that he was being paid $500 per trip for transporting it to Chicago. In addition, he claimed that his female companion was not involved.

Upon arriving at the security office, "Johnson" stated, "Go ahead and get the bags!" Agent Paulsen left to retrieve them. Then, Agent Loughridge gave "Johnson" another *Miranda* warning. Again, "Johnson" stated that he understood the warning and was willing to answer further questions. When asked how he obtained the marihuana, "Johnson" told the two agents that he had gone to Nogales, Mexico, paid for the marihuana there, and arranged to have it delivered to a site within the United States. "Johnson" then asked, "What can you do for me if I take it on to

Chicago?" When the agents replied that they could not promise leniency, "Johnson" stated, "Okay, I don't want to talk to you anymore. I want to talk to my attorney." Thereupon, the agents ceased questioning him. However, after a short hiatus, they did ask him about personal identification data (i. e., name, physical description, place of birth, etc.) for their "personal history sheet."

Approximately ten minutes after "Johnson" had requested an attorney, Agent Paulsen returned with the luggage. As soon as "Johnson" saw the luggage, he suddenly threw his arms into the air and exclaimed, "As you will probably find out, my name is not Johnson, it's Scheiblauer!" Then, he took a wallet out of his boot. From the wallet, he took out a card bearing the numbers necessary to open the combination lock on the footlocker. He then walked over to the luggage, uttered some profane statements about being "burned," kicked it a few times, opened the footlocker, and proceeded to throw its contents (including the 116 pounds of marihuana) onto the floor. Thereafter, he was taken to the U. S. Customs office in downtown Phoenix where the agents allowed him to call his attorney in Chicago.

On April 12, 1972, a hearing was held in the district court on Scheiblauer's pre-trial motion to suppress the marihuana and statements which he had made to the Customs agents. Mr. Femia and the three agents testified. The motion was denied.

Two weeks later, Scheiblauer waived his right to a jury and stood trial before the same district court judge who had denied his motion to suppress. By stipulation, the testimony taken at the hearing on his motion to suppress was incorporated by reference into the government's case-in-chief. The only further testimony was that of Agent Loughridge pertaining to the timing of Scheiblauer's admissions as they related to his request for his attorney. Scheiblauer rested his case without producing any evidence of his own. Subsequently, he was convicted of the above-mentioned crimes.

Scheiblauer contends that, at the time that the Customs agents arrested him, they lacked probable cause to do so. He alleges that his arrest occurred at the time Agents Adams and Paulsen initially restrained him. He reasons that, therefore, both the marihuana and his admissions were the "fruit" of his illegal arrest.

This contention was rejected by the district court when it denied Scheiblauer's motion to suppress and expressly found that the agents had merely detained him for investigative questioning. Presumably, the same finding formed part of the basis for the district court's guilty verdict.

Such a finding is supported by the record on appeal. At the time Scheiblauer alleges that he was arrested, the two agents merely identified themselves to their two suspects and told them that they wanted to ask them some questions. They did not use formal words of arrest. Although an arrest can be made without such words, in the above-mentioned circumstances, the absence of such words indicates that Scheiblauer was merely detained for investigative questioning.

In this Circuit, the brief detention of persons by police officers for limited investigative inquiry is well-established. However, for such detention to be legal, the police officers must have a "reasonable suspicion" that criminal activity is afoot. United States v. Jennings, 468 F.2d 111 (C.A.9, 1972); United States v. Davis, 459 F.2d 458, 459, fn. 3 (C.A.9, 1972); United States v. Brown, 436 F.2d 702, 705 (C.A.9, 1970); Arnold v. United States, 382 F.2d 4, 7 (C.A.9, 1967); Gilbert v. United States, 366 F.2d 923, 928 (C.A.9, 1966); Wilson v. Porter, 361 F.2d 412, 415 (C.A.9, 1966).

In this case, Agents Adams and Paulsen possessed such a reasonable suspicion at the time they initially restrained Scheiblauer and his companion.

Agent Loughridge had verified the information which had been relayed through the Tucson office and had told Agent Paulsen about it. In addition, Mr. Femia had told Agent Adams about Scheiblauer's inconsistent behavior regarding the luggage. Agents Adams and Paulsen had rendezvoused and pooled their information. In view of all of this information, those two agents' decision to detain Scheiblauer for investigative questioning was well-founded. It cannot seriously be contended that they acted in either an arbitrary or harassing manner.

■ That Scheiblauer may have thought that he had been arrested is of no consequence. We are convinced that, under similar circumstances, the average, reasonable person, would not have thought that he had been arrested. In any event, even if he did, such a person would at least have asked why the agents were accosting him and whether or not he was under arrest.

■ For reasons of his own, Scheiblauer reacted differently. Instead, he voluntarily accompanied the two agents to the main lobby where, after being given a *Miranda* warning, he stated that he understood the warning and would answer questions. At that time and place, he admitted ownership of the suspicious luggage (i. e., "You know what I have in the bag"). Immediately thereafter, while being escorted to the airlines' security office for further investigative questioning, he admitted that his luggage contained marihuana. By making these admissions, he provided the Customs agents with sufficient information to constitute probable cause to arrest him. United States v. Zubia-Sanchez, 448 F.2d 1232, 1233 (C.A.9, 1971); United States v. Fallis, 414 F.2d 772, 774 (C.A.9, 1969).

■ Scheiblauer further contends that his own acts of opening his footlocker and throwing the marihuana on the floor were, in substance, a warrantless "search" by the Customs agents. He alleges that, when the Customs agents responded to his request for an attorney by telling him that he could contact one "later" and by continuing to question him about personal data, he was led to believe that their earlier *Miranda* warnings were a mere formality and that they did not intend to honor his request. He reasons that, therefore, the marihuana and his subsequent incriminating statements were the "fruit" of this alleged "search."

The district court rejected this contention when it denied Scheiblauer's motion to suppress and expressly found that he had voluntarily opened his luggage and exposed the marihuana to the plain view of the Customs Agents. Presumably, the same finding led to the district court's guilty verdict.

The record contains sufficient evidence to support such a finding. Scheiblauer received two *Miranda* warnings and affirmatively stated that he understood them. Agent Paulsen reinforced Scheiblauer's awareness that he could properly refuse to open his luggage by telling him that, if necessary, a search warrant for the luggage would be obtained through the U. S. Attorney. Scheiblauer had already admitted that his luggage contained marihuana and had revealed both its source and destination. His acts of throwing his arms into the air and gesturing violently, his profane statements about being "burned" and his acts of kicking the luggage several times prior to opening it suggest that Scheiblauer belatedly realized that he had been caught redhanded and voluntarily decided to give up.

Affirmed.

CHAMBERS, Circuit Judge (concurring):

I concur. I believe the customs agents could take notice of the frequency of direct passenger service every day from Tucson to Chicago by American Airlines and Trans World Airlines. The incidence of a man and woman chartering a plane to go to Phoenix to catch an unneeded commercial flight to Chicago when there are frequent flights on Air

West, Frontier, American, Trans World and Cochise airlines to Phoenix, would be about one in a thousand if some smuggling were not involved. The chartered plane could be obtained in Tucson from a remote hangar, unlike the main air terminal, not under the full time surveillance of customs officers. Then there was the highly suspicious method of transfer from the chartered plane to the commercial plane at Phoenix. All this would lead to an articulable belief that customs "monkeybusiness" was afoot. I think there was immediate probable cause to search before any questioning. Certainly after a little questioning, the basis for a search got better.

I fully concur in Judge Byrne's opinion, but I set forth the foregoing as an alternate ground to uphold the sequence of the search and the ultimate arrest.