UNITED STATES of America,
Plaintiff-Appellee,

v.

John Eldon BECK, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

John W. DICKERSON,
Defendant-Appellant.

Nos. 77–2453, 77–2533.

United States Court of Appeals,
Ninth Circuit.

June 6, 1979.

S. Jeffrey Minker, Tucson, Ariz., for defendants-appellants.

Dale A. Danneman, Asst. U. S. Atty., Tucson, Ariz., for plaintiff-appellee.

Before WALLACE and ANDERSON, Circuit Judges, and WILLIAMS,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

In a trial without a jury, appellants Beck and Dickerson were convicted, respectively, of possession of cocaine and of possession of heroin, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). On appeal, they challenge as erroneous the denial of their motions to suppress evidence seized. We reverse.

## FACTS

At about 9:00 in the evening of Tuesday, March 8, 1977, three men entered the pedestrian gate at the Grand Avenue border entrance to Nogales, Arizona. Larry Swanson, a Customs Inspector on duty at the gate, stopped the men and, as was his routine, asked if they were U.S. citizens, if they had purchased anything, how long they had been in Mexico, and what they had been doing there. They responded that they were U.S. citizens, had been drinking 3 or 4 hours in Mexico and had made no purchases. Swanson smelled alcohol and thought the men appeared slightly inebriated. Upon request the men produced their drivers' licenses and identified themselves as John Beck, John Dickerson, and Dan McDowell, all from Missouri. Swanson noticed that Dickerson's hands were trembling and that he appeared to be nervous. He felt it was unusual that the men, although being from out of town, had not purchased anything.

Swanson asked all three men to step inside a secondary search area. They were asked to empty their pockets and roll up their sleeves. Dickerson's arms revealed what, to Swanson, appeared to be needle marks. When Swanson inquired about the marks, Dickerson stated that they were scars from intravenous feedings given during a recent hospital stay.

Customs Patrol Officers David Salomon and Juan Treto were also present in the detention area. Dickerson conversed with Treto and told him that he had come to Arizona because Beck wanted to check out the University of Arizona. Dickerson further related to Treto that he and his companions had arrived the previous day in Tucson, had taken a taxi to the bus depot, and from their had come by bus to Nogales. Beck had told Swanson that he had flown to Tucson to look at the University and planned to remain in the Nogales area several days.

* The Honorable David W. Williams, United States District Judge for the Central District of California, sitting by designation.

Swanson ran a computer check of the three men, but it was negative: no information was recorded on any of the three men. He then conducted a strip search of each man, but no contraband or weapons were found.

The three men were allowed to leave. Swanson, however, remained suspicious; he had a hunch and asked Agents Treto and Salomon to maintain a surveillance on the three men. When the three men left the inspection station, Treto followed them to the Siesta Motel in Nogales, where they were registered under their own names.

The next day, Wednesday, March 9, 1977, Treto requested that Alfred Smith, a radio coordinator in El Paso, Texas, contact the police department in Clinton, Missouri, about the three men. Smith later reported to Treto that the desk sergeant had recognized Beck's name as being involved locally in drugs and had identified Dickerson as Beck's sidekick, but that neither of the men had ever been arrested. At some unspecified time, Treto spoke directly with the sergeant in Clinton. Because he omitted the conversation in his report, he was unable to recall what he was told, but thought the officer mentioned that Beck was suspected of an offense involving the use of weapons.

Treto also learned that the three men had moved from the Siesta Motel to the El Dorado Motel, a nicer motel. The surveillance continued; a room next to the one assigned to McDowell was used by customs agents.

On Thursday afternoon, March 10, 1977, the three men took a taxi to the border and walked into Mexico. The customs patrol officers following them remained at the gate until it closed at midnight. Word was then left with the customs inspectors to look out for the three men. Surveillance at the motel also continued until midnight and then ceased. The three men were not observed again until the following day, Friday, March 11, 1977.

Dickerson was seen leaving the motel about 10:00 a. m. Friday. He went to a bank and obtained a safety deposit box.

He then returned to the motel about 20 minutes later. He left again shortly after and took a taxi to the border where he again crossed into Mexico by foot.

Beck and McDowell were first seen again returning to the motel in a taxi at about 4:00 p. m., Friday. Both were carrying large Mexican oil paintings. Dickerson was not with them, but was seen shortly thereafter leaving the motel room. He went to the bank again and upon his return stopped beside some hedges across the motel and appeared to be looking for something. At about 6:00 p. m., Beck and McDowell came out of the motel and also approached the hedges; one stood by while the other appeared to be looking for something. After the two men departed, a customs patrol officer searched the area and found nothing.

Before departing the motel, Beck had been observed making a telephone call in the lobby and noting airline information on a pad of paper. Treto later determined that the three men were booked on a flight from Tucson to Kansas City at 3:30 p. m. He decided then that he and other officers would make a stop of the men on the way to the airport.

On Saturday, March 12, 1977, at 1:38 p. m., the three men left the motel in a taxi. Nine customs patrol officers in four cars followed the taxi. The agents followed the cab for 20 minutes, and, according to arrangements made by radio, one CPO vehicle pulled in front of the taxi, one went to the left and the other behind to "box in" the taxi and pull it over. Emergency lights were also used. Six agents approached the taxi. The remaining three agents stood on the median strip across from the taxi. All were armed but no guns were displayed at any time. Beck was in the front seat of the taxi and McDowell and Dickerson were in the back. Treto approached the taxi on Dickerson's side, showed his badge and opened the taxi door, while the other agents proceeded to open the other doors. The three passengers were requested to get out of the taxi. No contraband or weapons were in sight, nor were there any suspicious

circumstances observed by the officers during this interval of time. Two agents took each man by the arms to different locations around the car. Treto and another agent escorted Dickerson to the rear of the taxi, between the taxi and a CPO vehicle. Treto asked Dickerson routine questions such as who he was, where he had been, and how long he had been in Nogales, even though he admitted he already knew the answers. According to Treto, Dickerson was nervous and his hand shook when he handed his driver's license to Treto. Treto then asked Dickerson if he minded if Treto searched him and his belongings, to which Dickerson replied either that he didn't mind or to go ahead. After Dickerson emptied his pockets, Treto frisked him. While patting him down, Treto felt a bulge in Dickerson's boots. He put his hand inside the boot and under the sock and felt something made of rubber. Treto then arrested Dickerson and advised him of his rights. The boots were subsequently removed to reveal to two packages of heroin wrapped in prophylactics.

Two other agents, Scimone and Herndon, had escorted Beck to the front of the taxi. While Herndon questioned Beck, Scimone simultaneously did a preliminary patdown. After Beck emptied his pockets, Scimone continued the patdown and noticed two large bulges in Beck's boot. He then asked Beck to remove his boot. As he did so, a package of cocaine, also wrapped in a prophylactic, fell out. A similar package was found in the other boot.

At the evidentiary hearing on the motions to suppress, the district court observed that the case was a close one, but concluded that the agents had founded suspicion to stop and detain the occupants of the taxi and that patdown searches were proper. It also specifically found that probable cause for arrest did not exist at the time of the stop and detention.

1. When we use "average" or "ordinary" person, we do so in the same sense as what the "reasonable man, innocent of any crime, would have thought had he been in the defendant's

### ARREST

Appellants preliminarily contend that the conduct of the nine customs patrol officers in effectuating the stop of the taxi in which they were passengers and in further detaining them was such as to constitute an arrest. Because the arrest was without probable cause, appellants further maintain, the arrest was illegal and the evidence seized must be suppressed accordingly.

The line between an arrest without probable cause and an investigatory stop based on founded suspicion is blurred and often difficult to detect, but the task here is less troublesome than in most cases. See *United States v. Ramos-Zaragosa,* footnote 3, *infra.*

■ Whether an arrest has occurred "depends on an evaluation of all the surrounding circumstances," *United States v. Richards,* 500 F.2d 1025, 1028 (9th Cir. 1974), *cert. denied,* 420 U.S. 924, 95 S.Ct. 1118, 43 L.Ed.2d 393 (1975), and not the subjective intent of the officers involved. *Taylor v. State of Arizona,* 471 F.2d 848, 851 (9th Cir. 1972), *cert. denied,* 409 U.S. 1130, 93 S.Ct. 948, 35 L.Ed.2d 262 (1973).

■ While recognizing that a suspicious individual may be briefly stopped and detained for the purposes of limited inquiry and weapons frisk, *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), or "to maintain the status quo momentarily while obtaining more information," *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), the dimensions of an encounter between the individual and officer may be sufficiently constrictive to cause the average person,[1] innocent of crime, to reasonably think that he was being arrested. See *United States v. Scheiblauer,* 472 F.2d 297, 301 (9th Cir. 1973).

■ In evaluating the surrounding circumstances of the encounter, a significant consideration is the extent that freedom of movement is curtailed. *Sibron v. New*

shoes," (*Coates v. United States,* 134 U.S.App. D.C. 97, 99, 413 F.2d 371, 373 (1969)), and not what the defendant thought.

*York,* 392 U.S. 40, 67, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Henry v. United States,* 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); *United States v. Strickler,* 490 F.2d 378, 380 (9th Cir. 1974). However, more than the restriction of liberty is required.[2] The other critical consideration is the degree and manner of force used in the stop and detention. But utilization of force in making a stop will not convert the stop into an arrest if it is precipitated by the conduct of the individual being detained, *United States v. Thompson,* 558 F.2d 522, 524 (9th Cir. 1977), *cert. denied,* 434 U.S. 973, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1977); *United States v. Richards,* 500 F.2d at 1028 29, or if it occurs under circumstances justifying fears for personal safety. *United States v. Russell,* 546 F.2d 839, 840 (9th Cir. 1976) (Wright, J., specially concurring).

▆▆▆ Utilizing the required objective analysis, we conclude that the arrest of Beck and Dickerson occurred prior to the discovery of the contraband by an overwhelming show of authority and by implied restraint which immediately ripened into actual physical restraint and custody. While the question is close, the contrary finding by the trial court that this was a mere investigatory stop and frisk is clearly erroneous.[3]

Beck, Dickerson and McDowell had shown no signs of hostility or resistance when they were first questioned and searched at the border four days before the abrupt interruption of their planned departure. If anything, the record demonstrates that they were cooperative and acquiescent throughout that prior encounter. They had no previous record of arrests or involvement

in smuggling. Furthermore, the search conducted then did not reveal any contraband or concealed weapons. The customs patrol officers also had appellants under surveillance for four days and observed nothing during that time to suggest that any of the three men were armed or dangerous. Treto did recall being advised by the sergeant in Missouri that Beck was a suspect in something involving weapons, but he did not include this information in his report and he admitted that his recollection of the conversation was extremely vague. Moreover, it does not appear that the information was conveyed to the other officers who accompanied Treto.

In addition, unlike the situation in *United States v. Russell, supra,* the stop did not take place late at night in an isolated area, where fears for personal safety would be justified, but in broad daylight on an open highway in an area purposely chosen because it would be difficult for anyone to flee across the terrain there.

Nor was there anything erratic or unusual about the progress of the taxi or the behavior of appellants to require precautionary force at the time the stop was made. The decision to take nine officers and stop appellants on the way to the airport had been made the night before. The plan to box the taxi in and pull it over and for two agents to take each man was arranged by radio communication as the taxi was followed out of town.

The officers were armed, though they apparently did not draw their guns. Once the taxi was pulled over, Treto, followed closely behind by five other agents, ap-

---

**2.** Restriction of liberty or movement remains as one of the factors to be considered in determining whether an arrest has been made under these circumstances. We need not, and do not, decide if restriction of movement remains as a relevant part of the analysis where there is a stop authorized by *Terry v. Ohio, supra,* followed by a "full-bloom" arrest.

**3.** As Judge Sneed put it in *United States v. Ramos-Zaragosa,* 516 F.2d at 145, "an arrest, unsupported by probable cause [cannot] be saved by redesignating it an investigatory stop." We are persuaded that *Terry v. Ohio*

does not sanction the police conduct here. Investigatory stops were permitted as "necessarily swift action predicated upon on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." 392 U.S. at 20, 88 S.Ct. at 1879. The circumstances here differ radically from the context in which *Terry v. Ohio,* supra, and *Adams v. Williams, supra,* were decided. On the evidence presented, the district court erred in not finding that an arrest occurred here.

proached the taxi, showed his badge and opened the door. The other agents surrounded the taxi while three more watched nearby covering the other officers. Although the three men unhesitantly complied with the officers' request to get out of the taxi and apparently made no threatening gestures of any kind, each was physically escorted by two agents to separate locations where they were then questioned and frisked.

We believe the ordinary citizen, innocent of criminal activity, but who had previously been stopped and searched at the border, would undoubtedly and reasonably have concluded that he was being arrested in the circumstances here. *Coates v. United States, supra.* The degree of force, even though no guns were drawn or pointed, was unreasonable; it was neither precipitated by the conduct of the appellants nor justified by the immediate environment and events. The circumstances of this case are similar to those in *United States v. Strickler, supra.* The court there held the arrest was complete when Strickler was encircled by police vehicles and confronted with official orders made at gunpoint. *See United States v. Ramos-Zaragosa,* 516 F.2d 141, 144 (9th Cir. 1975), and *Plazola v. United States,* 291 F.2d 56, 60 (9th Cir. 1961). We find that the arrest was complete in our case by the time each man was taken by two agents to separate locations, if not before.

The court below specifically ruled that there was no probable cause for an arrest. We agree with that determination. Most of the activity observed by the agents was innocuous and consistent with the behavior of a typical visitor. Any inferences to be drawn from their observed activities would be contrived at best. Finally, there is a strong suggestion that the stop and detention was a pretext or subterfuge to enable the officers to conduct a warrantless search after having failed to otherwise substantiate their suspicions during the four days of surveillance. The stop and detention of appellants did not occur under the usual exigent circumstances and was not motivated by the need to secure information; it was simply the last chance the officers had. We hold that the stop, with all of the attendant circumstances, was an arrest not based on probable cause, and therefore illegal.

The evidence subsequently seized was a product of the illegal arrest and must therefore be suppressed in accordance with the dictates of *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). See *United States v. Strickler,* 490 F.2d at 381.

REVERSED.

WALLACE, Circuit Judge, dissenting:

I cannot agree that the factual findings made by the district judge as to what occurred on March 12, 1977, were clearly erroneous. The arrest issue constitutes one of those close questions which makes deciding difficult. While I am in harmony with many parts of the majority opinion of my brothers, I am convinced that the test established for determining when an arrest occurs is faulty. Even applying that test, the closeness of the issue causes me to support the factual determination of the district judge. Therefore, I must respectfully dissent.

I

The district judge, after listening to and carefully weighing all of the evidence, came to the conclusion that this was a proper investigatory stop. That is, that there was a founded or reasonable suspicion present which allowed the customs officers to stop the taxi. *See United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (officers need reasonable suspicion to stop a vehicle); *United States v. Rocha-Lopez,* 527 F.2d 476, 477 (9th Cir. 1975) (founded suspicion and reasonable suspicion are substantially the same); *Wilson v. Porter,* 361 F.2d 412, 415 (9th Cir. 1966) (brief detention valid where officers had reasonable grounds for their action).

The majority never comes to grips with the question whether this finding of fact

was clearly erroneous. The majority states simply that the finding by the district judge "that this was a mere investigatory stop and frisk is clearly erroneous." At the conclusion of the majority opinion, however, in the discussion approving of the district judge's determination that there was no probable cause for an arrest, the majority seems to imply that the district judge was wrong in finding reasonable suspicion for the stop:

> Most of the activity observed by the agents was innocuous and consistent with the behavior of a typical visitor. Any inferences to be drawn from their observed activities would be contrived at best. Finally, there is a strong suggestion that the stop and detention was a pretext or subterfuge to enable the officers to conduct a warrantless search after having failed to otherwise substantiate their suspicions during the four days of surveillance.

In footnote 2 of the majority opinion, the majority suggests once more that it may not agree that the officers had reasonable suspicion.

To the extent that the majority has concluded that there was no reasonable or founded suspicion for an investigatory stop, the stop itself would have to be considered illegal. Therefore, under this formulation, any evidence secured by the customs officers as a result of that stop would be suppressed, *Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Strickler*, 490 F.2d 378, 380 (9th Cir. 1974), and the case reversed. Thus, the majority should not reach the issue of whether and at what point there was an "arrest." The statements of the majority indicating that the officers had no reasonable suspicion upon which to base even a stop make the majority's discussion pertaining to the arrest issue pure dicta. I cannot say, in reviewing the entire evidence, that I am "left with the definite and firm conviction that a mistake has been committed" by the district judge in finding that the officers had a reasonable suspicion to make the stop. *United States v. United States Gypsum Co.*, 333 U.S. 364,

395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). While our cases have not always been internally consistent, we have developed certain basic principles which guide our determination whether law enforcement officers have established that they had a reasonable suspicion in any particular case. In *Wilson v. Porter, supra*, 361 F.2d at 415, we stated that there is nothing necessarily unconstitutional in routine investigation and detention:

> [D]ue regard for the practical necessities of effective law enforcement requires that the validity of brief, informal detention be recognized whenever it appears from the totality of the circumstances that the detaining officers could have had reasonable grounds for their action. A founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing.

Viewing the evidence in the light most favorable to the government, *see, e. g., United States v. Glover*, 514 F.2d 390, 391 (9th Cir.), *cert. denied*, 423 U.S. 857, 96 S.Ct. 108, 46 L.Ed.2d 83 (1975), the following circumstances in the record appear to me to be significant: (1) the nervousness of Dickerson when he first came through the customs gate at the border; (2) the marks on Dickerson's arm, which the officers could reasonably conclude were needlemarks resulting from narcotic injections; (3) the claim of Dickerson and Beck that they had come to Arizona to investigate the University of Arizona at Tucson, which was contradicted by their admitted actions and, therefore, could lead the officers reasonably to conclude they were lying; (4) the report from the Clinton, Missouri Police Department that Beck and Dickerson were involved in drug trade there and that Beck was under suspicion for armed robbery; (5) the apparent spending of Thursday night in Mexico by Beck and Dickerson and their return to the United States by some means other than the customs gate through which they left; (6) the use of the pay phone in the lobby of the motel when there was a telephone available in their motel room; (7) the

suspicious activity of Beck and Dickerson in apparently looking for something in the hedges near their motel; (8) the extensive use of taxis for traveling unusually short distances in Nogales; (9) the rental and use of a safe deposit box by Beck and Dickerson despite their short stay in the area; and (10) the change of motels during their short stay. While no one of the above factors may be sufficient to justify founded suspicion and several are neutral on their face, the test is not whether the conduct may be deemed consistent with innocent activity, but whether under all the circumstances, the officers were reasonable in believing that criminal activity was involved. *United States v. Holland*, 510 F.2d 453, 455 (9th Cir.), *cert. denied*, 422 U.S. 1010, 95 S.Ct. 2634, 45 L.Ed.2d 674 (1975). Viewing these factors in a light most favorable to the government, I cannot say that the finding of reasonable suspicion was clearly erroneous.

Nor can I give any weight to the speculation of the majority that the stop on the way to the airport was a mere pretext. Such a factual finding would have to be made by the trial court and none was made in this case. The officers apparently waited until the last minute to secure all possible valuable leads during this investigation of a possible narcotics offense. They did not know what other evidence might be developed on the way to the airport. In addition, I find nothing improper with making the stop at a place which was safest for the officers.

## II.

Because I conclude that the finding of reasonable suspicion is not clearly erroneous, I must examine the charges made by Beck and Dickerson that, based upon the facts of this case, there was an arrest prior to the time the officers found the narcotics. The question is whether an investigatory stop, properly made pursuant to founded suspicion, became an arrest because of the actions of the customs officers. Resolution of this issue is critical due to the finding of the district court that the officers had no

probable cause for an arrest at the time they stopped the taxi. If the investigatory stop turned into an arrest prior to the officers finding probable cause, we would be required to suppress the evidence which resulted from the search in this case. If, on the other hand, there were no arrest, there would be no need for suppression because the evidence was found during a patdown, which is allowable pursuant to a reasonable suspicion stop. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The majority establishes three tests for determining when an arrest has taken place: (1) whether the average person, innocent of a crime, reasonably would think he was being arrested; (2) the extent that freedom of movement is curtailed; and (3) the degree and manner of force used to stop and detain.

The majority's first test refers to what the "average person" or "ordinary citizen" would believe under the circumstances; that is, would this hypothetical individual believe he was being arrested? The majority does not directly cite any case as authority for this test. The majority does refer to *United States v. Scheiblauer*, 472 F.2d 297, 301 (9th Cir. 1973), but that citation is properly preceded by *"See."* Indeed, *Scheiblauer* did not hold that there is any such test. The language in question is:

> That Scheiblauer may have thought that he had been arrested is of no consequence. We are convinced that, under similar circumstances, the average, reasonable person, would not have thought that he had been arrested. In any event, even if he did, such a person would at least have asked why the agents were accosting him and whether or not he was under arrest.

*Id.* It seems to me that this language was merely a response to an argument made by Scheiblauer in his appeal, and says nothing more than that Scheiblauer was not reasonable in his belief that he was being arrested. Significantly, if the first two sentences of the quoted passage are taken literally, as they apparently are by the majority, then consistency would require that the third

sentence also be taken literally. We would thus require defendants to make inquiry before they can be considered to be under arrest. That surely is not and should not be the law.

In addition, the average reasonable person test is unworkable in situations such as that before us. To apply the majority test, we must assume that an average reasonable person, unlearned in the law, can tell the difference between a temporary detainment and investigation by a police officer pursuant to *Terry* and an arrest. In both instances, the average reasonable person understands that his freedom of movement has been restricted. In both instances, the police officers will probably ask questions. It seems unreasonable to me to establish a rule which requires the "average reasonable person" to differentiate between these two types of police confrontations when judges and lawyers have such a difficult time analyzing them. Indeed, the average reasonable person simply does not have the necessary experience and legal understanding to make that differentiation.

The majority's second test requires an evaluation of the extent that the officers curtail a person's freedom of movement. In footnote 2 of its opinion, the majority does not reach the issue whether such a test is appropriate when there has been a stop pursuant to reasonable suspicion.[1] As I have concluded that the finding of reasonable suspicion was not clearly erroneous, I must reach that issue. The so-called restriction of liberty of movement test had its foundation in *Henry v. United States*, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). *See also Plazola v. United States*, 291 F.2d 56, 60 (9th Cir. 1961). While the *Henry* "restriction of freedom of movement" language has not been specifically overruled, it is no longer always helpful in determining when an arrest has taken place. In 1968, the Supreme Court established that police officers may "stop" an individual in circumstances which do not warrant an arrest. *Terry v. Ohio, supra,* 392 U.S. at 22, 30, 88 S.Ct. 1868. There is no doubt that in a *Terry*-type stop, a citizen's liberty of movement is curtailed and in fact restricted. Thus, where there has been a stop based upon a reasonable suspicion, the test should not be applied.

The third test relied upon by the majority is the "degree and manner of force used in the stop and detention." The majority concludes, on the basis of the evidence as a whole, that there was "an overwhelming show of authority" and "implied restraint which immediately ripened into actual physical restraint and custody," and holds that "the arrest was complete in our case by the time each man was taken by two agents to separate locations, if not before."

The overwhelming show of authority, as indicated by the majority, apparently is the following: (1) nine officers were involved; (2) the taxi was boxed in by three vehicles for the stop; (3) six officers approached the taxi; (4) the officers surrounded the taxi; (5) the officers were armed (although they did not draw their guns); and (6) two officers escorted each of the defendants to three different locations to be questioned and frisked.

In reviewing the factual findings of the district court in a light most favorable to the government, I do not conclude that they are clearly erroneous. None of the officers drew their weapons in spite of an indication that one of the defendants might be wanted for armed robbery and the implication therefrom that fatal danger might be involved. That knowledge, together with the fact that the officers were investigating what appeared to them to be a narcotics

---

1. The meaning of this statement eludes me. The majority purports to decide only that "the arrest was complete . . . by the time each man was taken by two agents to separate locations, if not before." Yet, either the majority, in footnote 2, indicates that it is actually deciding that an arrest occurred at the first instant that the officers stopped the taxi, *or* that there was no founded suspicion for the stop. If, although never openly considered by the majority, it is the latter, then, as I have already shown, the majority's analysis regarding when an arrest occurs is pure dicta; if it is the former, then it becomes difficult to understand when a stop is *ever* not an arrest.

importation offense, seems to me to justify the implicit finding of the district judge that the use of additional officers for greater protection was reasonable. Nor do I conclude that the district judge was wrong in not finding that because three vehicles were used instead of one that there was an arrest.

The decision to separate the three defendants for preliminary questioning when the taxi was stopped does not appear unreasonable. That two officers, rather than one, took each defendant aside did not seem to the district court to be unreasonable.

Thus, I cannot conclude, as does the majority, that there was an "overwhelming show of authority" in this case; indeed, under the circumstances, it does not appear to me to be an unreasonable response to the situation at hand. While some may disagree with the district judge's factual findings, I do not find them to be clearly erroneous.

This case provides a proper setting to determine when a proper stop pursuant to reasonable suspicion ripens into an arrest. It also give us an opportunity to define with more particularity the test which can be applied to determine at what point an arrest has occurred. I have concluded that there are three inquiries which would be appropriate: (1) What was the extent of the detention by the law enforcement officers? (2) What was the scope of the search made by the officers? and (3) Was the force used reasonable under the circumstances?

In response to the first inquiry, the extent of the detention here was not appreciably different from what would be expected in any *Terry*-type stop under similar circumstances. As to the second, there was no search other than a patdown, which was valid pursuant to the stop based upon reasonable suspicion. The real question arises under the third inquiry which, in essence, was stressed by the majority under its formulation of "the degree and manner of force used in the stop and detention." I would restate the test in order to determine whether what was done was reasonable. In this case, the trial court apparently believed

that the officers' response was not unreasonable under the circumstances and therefore that there was no arrest. That finding should not be overturned.

I would affirm the convictions.