BYBEE, Circuit Judge.
Appellant Mark Lamond Willis appeals the denial of his motion to suppress evidence following his conditional guilty plea for violation of 18 U.S.C. §§ 922(g) and 924(a)(2), felon in possession of a firearm and forfeiture of the firearm. Willis moved to suppress the firearm found in his possession as the fruit of an illegal seizure. See U.S. CONST, amend. IV. Finding his arguments unpersuasive, we affirm the district court’s denial of the motion -to suppress evidence and affirm Willis’s conviction.
I
Oh December 19, 2002, around 2:00 a.m., Las Vegas Metropolitan Police Department (“LVMPD”) Officer Carl Boehmer “observed a [white two-door] vehicle turning rapidly onto Las Vegas Boule *712 vard.... ” Officer Boehmer testified that the vehicle’s rapid turn attracted his attention because “[i]t was just a more excessive turn than a citizen should[make].” He followed the vehicle as it made two more quick turns before stopping in front of an apartment building in a high-crime area. Officer Boehmer then watched a male (later identified as Willis) get out of the car, sprint across the street and up the stairs to the second floor of an apartment building, and pound on the door until he was admitted into one of the apartments. When Officer Boehmer drove past the vehicle, he noticed that Willis had left the windows down, which he thought was unusual because there are “many stolen vehicles in that area ... [and] gang activity....” He then ran a check on Willis’s Colorado license plate, and notified his dispatch unit to request a backup unit.
The LVMPD Communications Center informed Officer Boehmer that the car was listed as a “suspicious vehicle” and that there was a National Crime Information Center (“NCIC”) missing person’s report or “hit” associated with the license plate.[1] After receiving this information, Officer Boehmer positioned himself in an alley where he could watch the car and the apartment. Shortly thereafter, Officer D. Miller arrived, and as Officer Boehmer was describing the situation, Willis exited the apartment, reentered his vehicle, made an illegal U-turn, and drove a short distance before pulling over in front of a second apartment complex a block or two away. Officers Boehmer and Miller each made U-turns, turned on their overhead lights, and boxed in Willis’s car.
As the officers parked their vehicles, Willis stepped out of his car and looked nervously from side-to-side at the patrol cars. Officer Boehmer testified that he believed that Willis was contemplating running away, and he ordered Willis to step in front of the vehicle and show his hands. Officer Boehmer testified that he “immediately began ordering commands to him to step to the front of my vehicle, and also to take his hands out of his pockets because at the time he had his hands in his jacket pockets.... [F]rom my experience again, someone that ... immediately opens up their vehicle and jumps out and begins looking side to side pretty frantically is, in my experience they’ve always taken off running. So before ... he had a chance to, I just started giving commands.”
Willis complied, and as Officer Boehmer approached him, Officer Boehmer asked, “Do you have anything on you I should know about?” Willis replied, “Yes, I do.” When Officer Boehmer asked “what is it?”, Willis answered: “a gun.” Officer Miller requested permission from Willis to look inside his pockets, which Willis gave, and the officer retrieved a fully loaded .25 caliber handgun from Willis’s jacket.
Officer Boehmer questioned Willis about the firearm while Officer Miller “proceeded to take care of the missing person[’s report].” Willis explained to the officers that the person identified in the report was his girlfriend and that she was in his apartment.[2] Officer Miller conducted an *713 interview with Willis’s girlfriend upstairs in the apartment complex. Officer Boeh-mer testified that “she was okay, and she stated that she had talked with her family and it [the NCIC missing person’s report] needed to be cleared out of the system.”
Willis admitted to the officers that he had been convicted of crimes in Hawaii and Colorado. Officer Boehmer confirmed this through a criminal history check, and he arrested Willis for being an “ex-felon in possession of a firearm, carrying a concealed weapon, [and] ex-felon failure to register.”
Willis moved to suppress the evidence of the handgun. He argued that the officers had violated his Fourth Amendment rights by detaining and searching him, and that the evidence of the handgun was the illegal fruit of that detention and search.- The magistrate judge concluded in his report and recommendation that the officers had no “reasonable articulable suspicion ... of criminal activity” to justify an investigatory Terry stop. See Terry v. Ohio, 392 U.S. 1, 20-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, the magistrate judge found that “[u]nder these circumstances ... Officer Boehmer’s community caretak-ing function required him to take reasonable steps in an effort to determine the current status of the alleged missing person. His failure to do so would have amounted to a dereliction of duty.”
Willis’s girlfriend was not in any danger. LVMPD requested that the Escondido Police Department ("EPD"), which issued the report, call and confirm that the missing person's report was still current. EPD confirmed the report, and asked LVMPD to send a "locate,” which is information stating that the missing person has been located in the area. LVMPD contacted Willis's girlfriend's family and EPD to give them information about her, but the record does not indicate when or if LVMPD sent the requested "locate” to EPD.
The district court adopted the magistrate judge’s report and recommendation over Willis’s objections. Willis entered a conditional guilty plea, preserving his objection to the denial of his motion to suppress the evidence recovered during the search. The district court sentenced Willis to a term of thirty-three months imprisonment. Willis appeals the denial of his motion to suppress.[3]
II
Willis argues that neither the community caretaking function nor the related emergency aid doctrine justified his seizure. He also argues that the police officers did not have reasonable suspicion for the stop, and that the government waived its arguments advocating reasonable suspicion when it failed to object to the findings of the magistrate judge’s report.[4]
*714 We decline to determine whether the community caretaking function, or the emergency aid doctrine, justified the officers’ detention of Willis. Instead, we hold that the detention came within the scope of a valid traffic stop, because Officer Boeh-mer had at least reasonable suspicion — if not probable cause — to stop Willis for violating the traffic laws. See Whren v. United States, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (“As'a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.”); see also Berkemer v. McCarty, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (“the usual traffic stop is more analogous to a so called ‘Terry stop’ than to a formal arrest”; holding that a traffic stop requires reasonable suspicion (internal citation omitted)); United States v. Lopez-Soto, 205 F.3d 1101, 1104-05 (9th Cir.2000) (“the Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops”; holding that “the Court in Whren [did not] intend[ ] to change this settled rule”). Since Willis’s detention was supported by reasonable suspicion, the officers could reasonably question Willis to ensure their own safety. Once Willis admitted possessing the weapon, the officers’ search to relieve Willis of his weapon was also reasonable.
A
“The Fourth Amendment prohibits ‘unreasonable searches and seizures’ by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.” United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citing United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Such investigatory stops are justified by “reasonable suspicion” that criminal activity may be afoot. Arvizu, 534 U.S. at 273, 122 S.Ct. 744; see also United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); Cortez, 449 U.S. at 417, 101 S.Ct. 690. “[T]he Fourth Amendment’s proper function is to constrain, not against all intrusions ... but against intrusions which are not justified in the circumstances, or which are made in an improper manner.” Schmerber v. California, 384 U.S. 757, 768, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The “touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.” Florida v. Jimeno, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (citations omitted).
Although we look to reasonableness in determining the propriety of a stop under the Fourth Amendment, the Supreme Court’s decision in Whren v. United States does not require us to determine the reasonableness of a temporary deten *715 tion if there is reasonable suspicion to conclude that a traffic violation occurred. Whren, 517 U.S. at 818-19, 116 S.Ct. 1769. In Whren, a unanimous Supreme Court held that a stop was reasonable under the Fourth Amendment where officers had probable cause to believe that the petitioner violated the traffic code, even if the ultimate charge was not related to the traffic stop. Id. at 808-09, 116 S.Ct. 1769. Police observed-a truck in a “high drug area” stopped at stop sign for an excessive amount of time, which then turned without signaling and sped off at an excessive speed. Id. at 808, 116 S.Ct. 1769. Once the police caught up to the vehicle, the officers observed Michael Whren, one of the passengers, holding two large bags of what appeared to be crack cocaine. Whren argued that the stop had not been justified by probable cause to believe that the occupants were engaged in illegal drug activity, and that the officers’ asserted ground for approaching the vehicle, which was to give them a warning about traffic violations, was pretextual. Id. at 809, 116 S.Ct. 1769.
The Supreme Court held that the officers had probable cause to believe that various provisions of the traffic code had been violated. Id. at 810, 116 S.Ct. 1769. The Court specifically declined to hold that the Fourth Amendment test for traffic stops should be “whether a police officer, acting reasonably, would have made the stop for the reason given.” Id. Rather, the Court explained that “[sjubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis,” and that “we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers.” Id. at 813, 116 S.Ct. 1769. Whren stands for the proposition that if the officers have probable cause to believe that a traffic violation occurred, the officers may conduct a traffic stop even if the stop serves some other purpose. See also De-venpeck v. Alford, 543-U.S. 146, 125 S.Ct. 588, 593-94, 160 L.Ed.2d 537 (2004) (“[The] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.”).
• There is ample evidence that the officers had at least .reasonable suspicion to stop Willis for his traffic violations. First, Officer Boehmer testified that he watched Willis make an illegal U-turn on Hoover. Second, Officer Boehmer testified that he watched Willis make a rapid turn, stating, “It was a traffic violation being that it was a turn — making a turn more excessive than it should have been [and] ... it would have been a municipal traffic code [violation].” Third, according to testimony by Officer Boehmer, Willis’s car also appeared to accelerate excessively. Cf. Whren, 517 U.S. at 808, 116 S.Ct. 1769 (police stopped car after it “turned suddenly to its right, without signaling, and sped off at an ‘unreasonable’ speed.”)
Officer Boehmer specifically noted that after he observed the rapid turn, “I was going to follow him to see if he had made any other — other traffic violations .... ” (emphasis added). It is clear from Officer Boehmer’s testimony that he observed several traffic violations, including driving too fast, rapid turns, and an illegal U-turn.[5]
, The fact that Willis had parked his ear at the point that the officers detained him does not affect our analysis. Officer Boeh- *716 mer did not stop Willis immediately after he first noted Willis’s traffic violations, but followed the car to “see if [Willis] made any other traffic violations.” Moreover, any delay between Willis’s traffic violations and the officers’ actions was insignificant. The officers detained Willis as soon as they observed him pull over.
Under Whren, we cannot second-guess the reasons for the officer’s stop. Whren, 517 U.S. at 813, 116 S.Ct. 1769 (“Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.”).[6] Indeed, the Supreme Court recently affirmed this proposition in Devenpeck: “Our cases make clear that an arresting officer’s state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.” 125 S.Ct. at 593-94. Therefore, as long as “the officers had probable cause to believe that [Willis] had violated the traffic code[,] ... the stop [was] reasonable under the Fourth Amendment.” Whren, 517 U.S. at 819, 116 S.Ct. 1769. The officer testified that he was planning on conducting a vehicle stop “because of the information of the NCIC missing person ... [and ] because of the way the vehicle was evading me and conducting an illegal U-turn also, in the middle of Hoover.” Since Officer Boehmer could have relied on the traffic violation as a justification for stopping Willis, the stop was valid under Whren.[7]
The dissent argues that Willis’s detention was not a traffic stop because *717 “Officer Boehmer never mentioned any traffic violation or issued any traffic citation.” Dissent at 725. But Officer Boeh-mer explained that by the manner in which Willis exited his car, Boehmer thought Willis was about to run. It was in the ensuing quick exchanges between Boeh-mer and Willis that Boehmer discovered that Willis was armed and arrested him. We think it was reasonable for the officers to view any traffic violations as inconsequential in light of Willis’s arrest. Whren and Lopez-Soto require that the officers have reasonable suspicion to stop a driver for traffic infractions, not that the officers issue citations.[8]
B
Once the police stopped Willis, they could, within reason, search the area and question Willis about weapons for their own safety. “Police officers are entitled to employ reasonable methods to protect themselves and others in potentially dangerous situations.” Allen v. City of Los Angeles, 66 F.3d 1052, 1056-57 (9th Cir.1995) (citing United States v. Jacobs, 715 F.2d 1343, 1345-46 (9th Cir.1983)). Our cases have justified the use of force in making a stop if it occurs under circumstances justifying fear for an officer’s personal safety. See Jacobs, 715 F.2d at 1345-46; United States v. Beck, 598 F.2d 497, 501 (9th Cir.1979). In this case, Officer Boehmer merely asked Willis if he had anything that Officer Boehmer should know about. He did not take more extreme measures, but simply asked Willis a question to ■ ensure the officers’ personal safety. Officer Boehmer did not act unreasonably in ensuring his personal safety and the safety of his fellow officer. Indeed, even before Officer Boehmer was notified about the NCIC hit, he requested backup for his own safety. As he testified, “I notified dispatch on the radio that I was requesting a backup unit.... For officer safety. Due to the suspicious situation, the known gang, prostitution and drug activity in the area ..-. for officer safety, I wanted another officer there, and the time of night.”
Given everything that the officers knew, including the NCIC hit, Willis’s erratic driving, the high-crime area, and Willis’s nervous and agitated state, Officer Boehmer’s question' to Willis eliciting information about Willis’s gun was reasonable. Once Willis informed the officers that he was carrying a firearm, the officers were entitled to seize the firearm in order to avoid any possibility that Willis would use it against them. The evidence of possession of a firearm was not the fruit of an illegal search, and the evidence need not have been suppressed.
Ill
The district court’s denial of the motion to suppress the evidence is affirmed. Willis’s conviction is affirmed.
AFFIRMED.

. The NCIC is “a national criminal records data system administered by the Federal Bureau of Investigation. See 28 U.S.C. § 534. NCIC contains criminal history information, including outstanding arrest warrants, and is available to police departments nationwide. State law enforcement agencies are connected to NCIC through their computer systems.” Case v. Kitsap County Sheriffs Dep’t, 249 F.3d 921, 923-24 (9th Cir.2001).

. LVMPD officers had stopped Willis and his girlfriend a week earlier, on December 12, in response to the NCIC report. During that encounter, police questioned Willis about the missing person's report and determined that

. We review the district court's denial of Willis's motion to suppress evidence de novo; the district court's factual findings are reviewed for clear error. See United States v. Feman-dez-Castillo, 324 F.3d 1114, 1117 (9th Cir. 2003).

. Willis argues that the government waived its reasonable suspicion argument by failing to present it to the district court when the district court adopted the magistrate judge’s report and recommendation denying Willis's motion to suppress. See In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management), 357 F.3d 900, 910 (9th Cir. 2004). Here, the government prevailed before the magistrate judge. A party prevailing before a magistrate judge need not object to the magistrate’s report and recommendation in order to preserve its right to argue an alternative theory in support of the recommendation on appeal. See Britt v. Simi Valley Unified Sch. Dist., 708 F.2d 452, 454 (9th Cir.1983) ("The language of [28 U.S.C. § 636(b)(1) ] does not indicate that failure to object to a magistrate’s recommendation will be an absolute bar to appeal from the district court's decision.”), overruled on other *714 grounds, United States v. Reyna-Tapia, 328 F.3d 1114, 1121-22 (9th Cir.2003) (en banc). But cf. McCall v. Andrus, 628 F.2d 1185, 1187 (9th Cir.1980) (holding that waiver is appropriate where a party's failure to object to the magistrate judge’s conclusions of law was coupled with its failure to raise the objection until its reply brief); Schmidt v. Johnstone, 263 F.Supp.2d 1219, 1222-24 (D.Ariz. 2003) (noting a possible intra-circuit conflict on whether a failure to object to a magistrate's conclusions of law waives the right to appeal them). Although Britt and McCall are to some degree in tension, Britt’s core holding — that a prevailing party need not object to a magistrate judge’s conclusions of law in order to preserve those grounds for appeal— remains good law, at least where the objections are raised on appeal in either the prevailing party’s opening or answer brief. See 28 U.S.C. § 636(b)(1).

. The dissent purports to take Officer Boeh-mer at his word, see Dissent at 16564, but then proceeds to doubt his observation that Willis committed traffic infractions. See id. at 16569-70, 16575-77. The dissent's doubts are based on the fact that the officer did not provide information such as the posted speed limit, the exact speed Willis was traveling or whether the incident occurred in a business district. But the officer has satisfied the gov *716 ernment's burden of production by coming forward with "specific and articulable facts,” Terry, 392 U.S. at 21, 88 S.Ct. 1868, to support his suspicion of illegal activity. The defendant has the burden of proof on a motion to suppress evidence, see United States v. Caymen, 404 F.3d 1196, 1199 (9th Cir.2005), and if Willis wanted to cast doubt on Officer Boehmer’s statement that his erratic behavior constituted a traffic infraction, he was required to introduce contrary evidence or get the officer to retract his testimony on cross-examination. Defendant did neither, so Officer Boehmer's testimony that he observed Willis committing traffic infractions stands unrefuted.

. The dissent relies on the fact that the magistrate judge "found that the officers did not have a reasonable suspicion of criminal activity that would justify a [Terry ] stop.” Dissent at 718. The magistrate judge found, in pertinent part, as follows:
Here, the court finds that the totality of the circumstances described by Officer Boeh-mer did not give rise to a "reasonable artic-ulable suspicion” that Willis was engaged in or about to engage in some identifiable form of criminal activity. Although Boeh-mer may have seen Willis exceeding the speed limit, the reason Boehmer wanted to stop him was not to issue a traffic citation; it was to inquire into the circumstances giving rise to the NCIC missing person hit. To the extent the magistrate judge made the same mistake as the dissent, by finding reasonable suspicion for a traffic stop lacking based on the officer's subjective motivations, we reverse. The parsing of police motives— as opposed to "articulable facts,” Terry, 392 U.S. at 21, 88 S.Ct. 1868 — is precisely what Whren tells us we may not do. See Whren, 517 U.S. at 811, 116 S.Ct. 1769 (refusing to "endors[e] the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred”).
Nor need we remand to establish the basis for a Terry stop. See Dissent at 16577-78. The magistrate judge made a factual finding after an evidentiary hearing that Willis "made a U-turn on Hoover.” Officer Boehmer testified that this turn was illegal, and his testimony is unrefuted. The magistrate judge’s statement that "[t]he court need not assess the credibility of the officer's testimony about Willis's driving” presumably refers only to Officer Boehmer's testimony that Willis was traveling at an excessive rate of speed, since the excessive speed allegation — unlike the fact that Willis "made a U-turn on Hoover” — was not part of the magistrate judge's factual findings. Because the illegal U-turn was sufficient to justify the traffic stop, no remand is required.

. Willis also argues that the evidence seized in the stop should be excluded because the police had stopped Willis the week before *717 based on the same NCIC report. We find no basis for excluding the evidence. There is nothing in the record that shows Officers Boehmer and Miller were aware that the NCIC missing person's report was outdated, nor is there evidence that the LVMPD deliberately failed to send a ''locate” to the Escondido Police Department. In any event, because the officers had at least reasonable suspicion to stop Willis for a traffic violation, the validity of any other reasons they may have had to stop him becomes irrelevant.

. Indeed, in Whren, the plainclothes vice officer who stopped Whren after observing apparent traffic violations testified that "he did not intend to issüe a ticket to the driver for stopping too long at the stop sign, but he wished to stop the Pathfinder to inquire why it was obstructing traffic and why it sped off without signalling in a school area.” United States v. Whren, 53 F.3d 371, 373 (D.C.Cir. 1995), aff'd, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).