**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jan W. JACKSON, Defendant-Appellant.**

**No. 756, Docket 80–1423.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 3, 1981.

Decided June 15, 1981.

Wesley L. Taylor, Jr., Buffalo, N. Y., for defendant-appellant.

Cheryl S. Fisher, Asst. U. S. Atty., W. D. N. Y., Buffalo, N. Y. (Richard J. Arcara, U. S. Atty., W. D. N. Y., Buffalo, N. Y., of counsel), for plaintiff-appellee.

Before WATERMAN, MANSFIELD and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Jan Jackson appeals from a judgment of conviction for bank larceny in violation of 18 U.S.C. § 2113(b) (1976) entered in the United States District Court for the Western District of New York, Curtin, *Ch. J.* Appellant pled guilty following the denial of his motion to suppress certain evidence, reserving his right to challenge on appeal the denial of his suppression motion. He was sentenced to a prison term of nine years.

Appellant drove the getaway car in a holdup of a branch of the Manufacturers and Traders Trust Company (M & T Bank) in Buffalo, New York on March 4, 1980. After he was apprehended, a search of the car's trunk revealed a revolver, M & T Bank wrappers and appellant's accomplice, Edward Dixon, who had actually robbed the bank.[1] Appellant argues that the search of the trunk and his arrest were illegal and that therefore the evidence discovered in the trunk and any statements made subsequently should be suppressed. We affirm Judge Curtin's denial of the suppression motion.

## BACKGROUND

The evidence viewed in the light most favorable to the government, as it must be in reviewing the denial of a motion to suppress, *United States v. Oates,* 560 F.2d 45, 49 (2d Cir. 1977); *see United States v. Vital-Padilla,* 500 F.2d 641, 642–43 (9th Cir. 1974); *United States v. Walling,* 486 F.2d 229, 236 (9th Cir. 1973), *cert. denied,* 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974), is as follows.

About 10:00 a. m. on March 4, 1980, the M & T Bank alarm sounded in the 17th precinct house of the Buffalo, New York, Po-

---

1. Dixon did not join this appeal, although he moved below for the suppression of his confession and the fruits of the search. He pled guilty to bank robbery in violation of 18 U.S.C. § 2113(a) (1976) and was sentenced to a term of nine years.

lice Department. It took Detective Sergeant Coyle and his partner, Detective Morrison, about one minute to drive to the bank on the corner of Hertel Avenue and Parkside Avenue. Coyle entered the bank and received a description of the robber as a black male in his twenties with a medium "afro," approximately six feet tall, weighing 150 pounds, and wearing a light brown coat, matching hat and a grey sweater. He also learned that the robber had gone north on Parkside Avenue on foot about twenty seconds before Coyle arrived. Coyle relayed the information to Detective Young who joined him at the bank, and together with Detective Morrison they drove their unmarked car slowly north on Parkside Avenue looking for the robber. Morrison drove, with Coyle riding in the passenger seat and Young sitting in the rear. After the detectives had proceeded a short way, Young yelled to Morrison to turn the car around because he had seen someone who might be a suspect in the bank robbery. Young had observed a Dodge Coronet stopped in traffic, heading south on Parkside and thus from the vicinity to which the robber had fled. Young testified that the driver of the Coronet appeared to be a black male in his twenties with a medium afro and a tan coat. The Dodge was stopped in traffic near the bank and Young thought it was suspicious that the driver kept staring straight ahead, deliberately ignoring the commotion caused by the many police cars near the bank. The officers radioed a short description of the Dodge and its driver and asked that it be stopped for investigation. By the time they turned around, a maneuver which had to be accomplished in heavy traffic, the Dodge was already at least two to three hundred feet ahead of them. They finally lost sight of the Dodge about three-quarters of a mile from the bank. Fortunately, another squad car almost immediately radioed that they had spotted the Dodge and pulled it over at a street corner about two miles from the bank. Coyle and his companions proceeded directly to the scene and found the driver already outside his car conversing with the officers.

Coyle approached the driver and asked him his name and where he was coming from. The driver said his name was Jan Jackson and that "he was coming from Hertel Avenue, dropping his mother off." (Tr. 8). This response probably aroused Coyle's suspicion, since Coyle knew that Jackson had not dropped anyone off when he drove down Parkside past Hertel. Coyle did notice, however, that Jackson did not entirely fit the description of the robber. Although the driver was a black male in his twenties with a medium afro and was about six feet tall, he was about fifty pounds heavier than the described thief, and significantly, his clothing differed from that of the reported robber. Appellant's coat, which had looked tannish from a distance, appeared on closer examination to be a light grey tweed; his sweater was green instead of grey; he was not wearing a tan hat. Coyle wondered if Jackson had changed his clothes, as do many robbers immediately after a holdup. He circled Jackson's car looking for clothing and other clues. As he passed the trunk, he noticed that its lock had been punched out and was missing. At the same time, he heard a noise which "sounded like it was in the trunk, like a tire fell, movement in the trunk, a thump." (Tr. 20). After hearing the thump, Coyle asked Jackson how he got into his trunk and Jackson replied that he did not get into his trunk. Judge Curtin found that by this time, Coyle had probable cause to search the trunk.

More police had arrived and several officers joined Coyle in what proved to be a considerable effort to open the trunk. After initial attempts to jimmy the lock with a screwdriver proved unavailing, one of the officers spotted a wriggling finger inside the lock hole. An officer's shouted order ended the finger's efforts to push the screwdriver aside and the trunk came open. In the trunk was Edward Dixon, a black male in his twenties wearing a grey sweater, a light tan coat, and a matching hat atop a medium afro. A frisk yielded a revolver and some bank slips from an M & T Bank. Jackson and Dixon were then arrested for

the bank robbery. Later that day at police headquarters, both men confessed.

## DISCUSSION

On this appeal, Jackson claims that the evidence discovered in the trunk and his subsequent confession were fruits of an illegal arrest and search. If, as Jackson claims, the evidence and confession were so derived, then they would indeed have to be excluded. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Our review of the events surrounding the stop and subsequent search, however, does not reveal any unlawful conduct.[2] We therefore affirm for the reasons stated below.

### A. The Legality of the Stop

At the outset, we agree with the appellant that there was no probable cause to arrest the driver of the Dodge Coronet at the time that that vehicle was stopped. The government contends, however, that the detention was an investigative stop for which probable cause was not necessary. *See Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An investigative stop is legal only if it is reasonable under the Fourth Amendment. *Brown v. Texas,* 443 U.S. 47, 50, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); *Terry v. Ohio, supra.* In determining the reasonableness of a *Terry* stop, a reviewing court must examine both "the basis for the stop and the degree to which the stop restrains the individual." *United States v. Vasquez,* 638 F.2d 507, 520 (2d Cir. 1980). We examine these factors in turn.

### 1. The Basis for the Stop

The Supreme Court has approved investigative stops of automobiles based upon an officer's "reasonable suspicion" that criminal activity is afoot. *Terry v. Ohio, supra.* As the Supreme Court has explained:

In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams, supra,* 407 U.S. at 145–46, 92 S.Ct. at 1922–1923 (citations omitted). The police must, however, be "aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the suspect is engaged in criminal activity. *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). The decision to order an investigative stop of the Dodge meets this objective test because Coyle and his companions were aware of a number of facts which reasonably warranted the suspicion that the driver of the Dodge was the bank robber.

Detective Young's initial observation revealed that the age, race, hairstyle, and coat color of the driver all appeared to match the description of the robber. Although closer observation of Jackson during the investigative stop indicated that he was not wearing the exact clothing ascribed to the robber, Judge Curtin properly found that Young had reasonably believed that the driver fit the description of the robber. Furthermore, the Dodge was coming from the direction in which the robber had fled on foot less than five minutes before. And

2. Young conducted a search of the front seat of Jackson's car. The legality of this search was not determined below and need not be decided here because it did not yield any evidence against Jackson.

finally, the driver acted suspiciously, strangely intent upon ignoring the tumult created by the police activity near the bank. All these factors created a reasonable suspicion that the driver was linked to the robbery. *See United States v. Brignoni-Ponce, supra,* 422 U.S. at 884–85, 95 S.Ct. at 2581–2582; *United States v. Hall,* 557 F.2d 1114, 1116–17 (5th Cir.), *cert. denied,* 434 U.S. 907, 98 S.Ct. 308, 54 L.Ed.2d 195 (1977); *United States v. Santana,* 485 F.2d 365, 368 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974). Thus, it was entirely appropriate for the Dodge to be pulled over for an investigation.[3]

2. *The Reasonableness of the Restraints*

■ Appellant argues that the restraints imposed during the stop of his vehicle exceeded the bounds of an investigatory stop, contending that such conduct is permissible only in the context of a legal arrest. Therefore, appellant argues, since the detention was neither a legal *Terry* stop nor a legal arrest, the confession must be suppressed. We find this contention to be without merit.

■ To convince us that an illegal arrest, and not a *Terry* stop, occurred, appellant relies heavily on the fact that one of the two officers who made the stop drew his gun as his partner approached Jackson's car.[4] But we do not find it unreasonable for a policeman to draw his gun when he approaches a car whose driver may be an escaping armed bank robber. Although the drawing of a weapon may be a significant factor in determining whether a suspect is under arrest, it is not dispositive of the issue. *See United States v. Oates, supra,* 560 F.2d at 57; *United States v. Beck,* 598 F.2d 497, 501 (9th Cir. 1979). In this case, although Officer Smardz had his revolver

out of its holster, ready in case of trouble, nothing in the record indicates that he ever pointed it at Jackson. *Cf. United States v. Vasquez, supra,* 638 F.2d at 522 (arrest did not occur until the moment when officers leveled their guns at the occupants of the car). He returned the gun to its holster as soon as his partner's frisk of Jackson ensured that he was not armed. More important, an officer who decides to draw his gun, like an officer who decides to frisk a suspect, "need not be absolutely certain that the individual [he approaches] is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883. This belief that the suspect may be armed and dangerous "can be predicated on the nature of the criminal activity involved." *United States v. Oates, supra,* 560 F.2d at 62. An officer approaching a suspected bank robber could reasonably infer from the nature of the crime that the suspect may well be armed and dangerous. Indeed, in this case, the subsequent search of Dixon yielded a revolver. Under these circumstances, Smardz and his partner were fully justified in the measures taken to protect themselves.

■ To allow such protective measures to transform an investigative stop into an arrest would create a dangerous dilemma for the police officer in those situations, like this one, where suspicion does not rise to the level of probable cause. If the officer approaches a suspected robber with his gun still in his holster, he increases the risk that he will be shot. If, on the other hand, he protects himself by drawing his gun, he increases the risk that a court will set the criminal free by construing his action as an

---

3. The officers who responded, Smardz and his partner, had the same right to stop the Dodge as did Coyle and his companions. *Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971). Under the circumstances here, pulling the Dodge over was an intermediate response that was "the essence of good police work." *Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612 (1972).

4. Nothing in the record reveals how the police indicated to Jackson that he should pull over. Therefore, we cannot evaluate the reasonableness of the manner in which this was done. Presumably, Jackson's defense counsel would have brought out at the suppression hearing any facts favorable to his client.

illegal arrest. We decline to impose such a Hobson's Choice on our law enforcement personnel. Sadly, it is as true today as when *Terry* was decided that:

> Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.

*Terry v. Ohio, supra,* 392 U.S. at 23, 88 S.Ct. at 1881.

▆▆▆▆ Having rejected the argument that Smardz's drawn gun shows that Jackson was under arrest, we see no significant differences between the police conduct here and the conduct which occurs in any investigative stop. For example, there is no showing that Jackson was handcuffed or told that he was under arrest. Instead, the record shows that Jackson was detained but a few minutes waiting for Coyle to arrive and continue the investigation. Coyle, of course, had every right to ask Jackson his name and what he had been doing, for "the right to interrogate during a 'stop' is the essence of *Terry* and its progeny." *United States v. Oates, supra,* 560 F.2d at 63. Probable cause to search the trunk developed almost immediately after Coyle's arrival and, at that point, Jackson obviously had to be detained until the police determined if there was indeed someone hiding in the trunk. Our examination of the police conduct thus reveals that the restraints on Jackson's freedom were reasonable in light of the basis which the officers had for making the stop.

### 3. *Effect of Smardz's Belief*

▆▆▆▆ The only remaining question concerning the legality of the stop is whether Smardz's subjective belief that his partner had placed Jackson under arrest soon after the frisk is sufficient to convert an otherwise valid *Terry* stop into an arrest. Because the objective conduct of the police was consistent with an investigative stop, we decline to find that an arrest occurred solely because of Smardz's subjective belief. Objective rather than subjective factors govern the propriety of both stops and arrests. *United States v. Oates, supra,* 560 F.2d at 58; *United States v. Vital-Padilla, supra,* 500 F.2d at 644. *See Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1879 ("it is imperative [when assessing the propriety of stops and arrests] that the facts be judged against an objective standard"). *United States v. Oates, supra,* supports our reasoning. In that case the accused, Oates, was removed by several police officers from a line of passengers who were waiting for an airplane. He was taken to an airport office for questioning. In the office, additional evidence was developed against him and he was formally arrested. Oates claimed that he had been under arrest from the moment that he was removed from the line of passengers. The government, however, claimed that Oates initially had been subjected to an investigative stop and that the arrest had not occurred until he was in the office. An analysis of the objective factors convinced our Court that the government was correct. Oates urged, however, that "crucial importance" should be given to the subjective beliefs of one of the investigating officers who apparently had decided to arrest Oates even before he was removed from the line. Applying an objective standard, we ruled that even if that officer thought that his fellow officers were arresting Oates, "this subjective belief ... would not affect the validity of the detention instituted independently by [his fellow officers] if all the circumstances, viewed objectively and apart from what [the officer may have thought], disclose that the detention was a stop and not in fact an arrest." *Id.* at 58 (citations omitted). Similarly, in this case Smardz's belief that Jackson was under arrest does not change our conclusion, based upon the objective actions taken, that Jackson was subjected only to an investigative stop prior to the opening of the car trunk. It follows from this conclusion that Jackson was not arrested until after Dixon was found in the trunk and that Jackson's arrest was therefore legal.

## B. *Probable Cause to Search the Trunk*

The general rule, of course, is that warrantless searches are unconstitutional. *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–2032, 29 L.Ed.2d 564 (1971). But the Supreme Court has long recognized the need to permit some warrantless searches of vehicles because of their mobility and the ease with which evidence hidden in them may be removed. *See Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). Thus, the warrantless search of the car's trunk was legal only if the police had probable cause to believe that the vehicle contained evidence of a crime. *Chambers v. Maroney,* 399 U.S. 42, 48, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970); *Carroll v. United States, supra,* 267 U.S. at 153, 45 S.Ct. at 285.

We have no difficulty agreeing with Judge Curtin's finding that Coyle had probable cause to search the trunk. A number of objective facts indicated that evidence of the holdup was in the trunk. First, there were the facts which had initially created Coyle's suspicion that Jackson was involved in the bank robbery: the driver of the Dodge generally matched the description of the robber and had acted suspiciously while driving past the bank. Additional facts developed once Coyle arrived at the scene of the stopped car and continued the investigation. Jackson's answer to Coyle's query about what he had been doing was unconvincing. Although he said that he was coming from Hertel Avenue after dropping his mother off, the officers had seen him drive right past Hertel Avenue without dropping anyone off.[5] After Coyle got a good look at Jackson, he discovered that, except for Jackson's clothing and weight, he fit the description of the robber quite closely. Jackson's height, age, race, and hairstyle all fit the description. At this point, it was entirely reasonable to look into and around Jackson's car for the clothing worn by the robber. *See United States v. Vasquez, supra,* 638 F.2d at 521 ("each action taken [by police] was reasonable in light of what had gone before"). While Coyle was passing the trunk, he noticed that the lock had been punched out and he heard a thump "like a tire fell, movement in the trunk." Coyle's testimony on this point is corroborated by a remark in Dixon's confession which shows that he was trying to hide the stolen money in the wheel well at about the time that Coyle was near the trunk. After hearing the thump, Coyle asked Jackson how he got into his trunk and Jackson gave the incredible response that he never did. We do not hesitate to conclude, as did Judge Curtin, that by the time Jackson made this reply, if not earlier, there was probable cause to search the trunk.[6] Therefore, since the search of Jackson's trunk was legal, the fruits of that search—Dixon's presence in the trunk, the

---

5. Judge Curtin did not base his finding of probable cause to search the trunk on this statement by Jackson. He did not think that Coyle could necessarily conclude that Jackson was lying about dropping his mother off because Jackson's statement might only have meant that he had dropped his mother off somewhere near Hertel Avenue. Nevertheless, we believe that his somewhat suspicious reply to Coyle enhances the strength of Judge Curtin's conclusion that Coyle's reasonable suspicions about Jackson were sufficient to justify the investigative stop.

6. It is, of course, irrelevant that probable cause arose in the course of an investigatory stop which was originally based on reasonable suspicion. *United States v. Oates, supra,* 560 F.2d at 63. Indeed, even if Coyle had already planned to search the trunk before probable cause arose, the search would be lawful because, at the moment that the search began, there was probable cause to search it. *United States v. Oates, supra,* 560 F.2d at 57–58; *United States v. Laird,* 511 F.2d 1039, 1040 (9th Cir. 1975) (per curiam).

It makes no difference that an important fact establishing probable cause was a noise. Probable cause can be established by a suspicious sound as it can be by a suspicious smell or appearance, *see, e. g., United States v. Cantu,* 548 F.2d 1243, 1244 (5th Cir. 1977) (per curiam) (smell of marijuana creating probable cause); *United States v. Laird,* 511 F.2d 1039, 1040 (9th Cir. 1975) (per curiam) (same). In *United States v. Butler,* 533 F.2d 221, 223 (5th Cir. 1976), narcotics officers relied upon the sound of a blender to help establish probable cause to conduct a warrantless search of a hotel room. The officers suspected that the blender had been used to cut cocaine or heroin.

items in his possession, and the subsequent confessions of both men—were admissible into evidence.

## CONCLUSION

We conclude that the police had reasonable suspicion to pull over appellant's car and that in so doing they did not unreasonably restrain him. The initial apprehension was therefore a valid investigative stop and not an illegal arrest. During the course of that investigatory stop, facts developed which gave the officers probable cause to search the trunk, after which point the police had probable cause to arrest the suspects.[7] Thus, the evidence discovered in the trunk and the confessions derived therefrom were not products of an illegal arrest or search. We therefore affirm the denial of appellant's motion to suppress.

Affirmed.

MANSFIELD, Circuit Judge (dissenting):

I dissent. Even assuming that the police had sufficient specific and articulable facts at the outset to provide them with a reasonable suspicion justifying a *Terry*-type investigatory stop of Jackson, which is questionable, the record is clear beyond doubt that instead of merely making such a stop they immediately arrested Jackson without probable cause. Their later warrantless search of the car trunk was the fruit of that unlawful arrest. If constitutional rights are to mean anything, the evidence uncovered as a result of their unlawful arrest of Jackson must be suppressed, even though the effect may be to release a wrongdoer. See *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

We should not attempt to avoid the impact of the exclusionary rule through the subterfuge of characterizing an unlawful arrest as an investigative stop. To do so imperils our own integrity and undermines public confidence in the rule of law, which must be applied regardless how the chips may fall in a particular case. The words of the Supreme Court in *Mapp v. Ohio*, 367

U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), are pertinent:

"There are those who say, as did Justice (then Judge) Cardozo, that under our constitutional exclusionary doctrine '[t]he criminal is to go free because the constable has blundered.' *People v. Defore*, 242 N.Y. [13], at 21, 150 N.E. [585], at 587. In some cases this will undoubtedly be the result. But, as was said in *Elkins [v. United States]*, 'there is another consideration—the imperative of judicial integrity.' 364 U.S. [206], at 222 [80 S.Ct. 1437, at 1447, 4 L.Ed.2d 1669]. The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence. As Mr. Justice Brandeis, dissenting, said in *Olmstead v. United States*, 277 U.S. 438, 485 [48 S.Ct. 564, 575, 72 L.Ed. 944] (1928): 'Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example.... If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.'" (Footnote omitted). 367 U.S. at 659, 81 S.Ct. at 1693–1694.

The proof that Jackson was unlawfully arrested without probable cause is overwhelming and uncontroverted. Officer Smardz testified that he and his partner, Holycross, pulled over Jackson's car and with guns drawn immediately ordered him out of it. After Holycross placed Jackson against his car and patted him down, while Smardz kept his gun out, Jackson was moved away from his own car and over to the police car. All of these actions took place before anyone's attention had been drawn toward Jackson's trunk. At the suppression hearing, Officer Smardz was asked, "[A]t the time that Mr. Jackson was taken by your partner over to the police car, was Mr. Jackson under arrest at that time?" As a law enforcement official well versed in

---

**7.** We believe that our dissenting brother misreads the record as to the sequence of events

and the time that elapsed between the stopping of the Dodge and the sound of the thump.

the technique of making an arrest, he responded with an unequivocal "Yes." He also testified that he believed his partner had formally placed Jackson under arrest. No other officer testified that Jackson was arrested at some later time. Throughout Smardz's examination, he exhibited no awareness that the radio order to stop Jackson's car had been unsupported by probable cause, or that he was supposed to have detained Jackson by means less intrusive than an arrest. When asked who gave him the authority to arrest, he merely replied, "Nobody. He was a suspect in a bank holdup."

That there was an immediate arrest of Jackson before any search rather than merely an investigative stop is further confirmed by all of the other evidence. Before any attempt was made to open the trunk, Jackson's car was literally surrounded by police. Police witnesses admitted that between five and ten cars and between a dozen and twenty-five officers [1] were spaced around Jackson's car, while he was kept away from the car, before the call came to search his trunk. This conduct alone has been properly held to be an arrest, not an investigative stop. See *United States v. Beck*, 598 F.2d 497, 501 (9th Cir. 1979) (where nine officers, without drawing guns, ordered a taxi off the road and surrounded passengers, show of force was sufficiently intrusive to constitute an arrest); *United States v. Strickler*, 490 F.2d 378, 380 (9th Cir. 1974) (arrest occurred when the car was surrounded by officers issuing orders at gunpoint). As we observed in *United States v. Vasquez, supra*, 638 F.2d at 520, "[I]f probable cause is lacking, the intrusion must be no greater than the circumstances require." The siege of an individual by a large number of police cars and officers is inconsistent with the sense of restraint that is essential to the legitimacy of any investigative stop. See *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct.

2248, 60 L.Ed.2d 824 (1979); *United States v. Vasquez, supra*, 638 F.2d at 520–21.

Furthermore, Detective Young, who spotted Jackson in traffic in the first place and was armed with a description of the robbery suspect, acted in complete disregard for Jackson's rights as an individual whom there was no probable cause to arrest. Young formulated the requisite reasonable suspicion for a *Terry* stop and radioed the order to stop Jackson's car based only on Jackson's race, his extremely general resemblance to the description given of the robber, the direction of his car's movement, and his impassiveness as he drove by the bank during the post-robbery commotion. When Young and his partner, Sergeant Coyle, reached the scene of Jackson's detainment, Coyle at once noticed that Jackson was wearing different clothes from those reported to have been worn by the robber and was at least 50 pounds heavier than the robber had been described to be. Young did not thereupon even bother to approach Jackson to ask him any question, ascertain his identity, or determine whether he fitted the description of the man he was seeking, as might have been expected of an officer executing a temporary detention. Instead, he admitted,

> "I immediately went to the driver's door of the '69 Brown Dodge Coronet and crawled into the front seat and began to feel under the front seat and under the dashboard for weapons or possible evidence from the hold up, the bank hold up."

This unlawful search took place before any attention had been directed toward the trunk. The warrantless search of portions of a car's interior that are not in plain view is clearly unconstitutional unless its occupant has been arrested under the authority of either a valid warrant or probable cause, which was not the case here. *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970); *United States*

---

1. Sergeant Coyle stated that his car and four others had arrived at the scene of Jackson's detention when he heard the thump in the trunk, and that more arrived thereafter. Officer Croft remembered 10 cars and 25 officers. Officer Smardz estimated that five cars had drawn up, with 10 or a dozen officers, by the time attention was drawn to the trunk.

*v. Ocampo,* 650 F.2d 421 (2d Cir. 1981). Young's actions, which incontestably would have violated Jackson's Fourth Amendment rights if he had been only stopped under the authority of *Terry,* reinforce the conclusion that Jackson was subjected to an arrest rather than an investigative stop.[2]

The majority misconstrues established law in refusing to view the openly visible drawing of police guns as relevant to the determination of whether Jackson was arrested or merely subjected to an investigative stop. When we declined to hold that the drawing of a gun automatically transformed a stop into an arrest in *United States v. Vasquez, supra,* relied upon by the majority, we did so in explicit reliance on the arresting officer's testimony that his drawn gun was undetectable by the person he stopped, "at his side, not outstretched or otherwise in evidence." *Id.* at 522. We then proceeded to hold, in accordance with the usual and appropriate approach to the impact of drawn guns, that "the arrest did not occur before the officers leveled their guns at the Mesas and ordered them out of their car." *Id.* See also *United States ex rel. Walls v. Mancusi,* 406 F.2d 505, 508–09 (2d Cir.), *cert. denied,* 395 U.S. 958, 89 S.Ct. 2099, 23 L.Ed.2d 745 (1969) ("In the instant case the arrest, for purposes of constitutional justification, occurred at the moment Officer Johnson ordered relator out of the truck at gunpoint"); *United States v. Oates, supra,* 560 F.2d at 57. (In finding detention not to be an arrest, we noted that "while not dispositive, it is significant that here, unlike the situation in *United States v. Lampkin,* 464 F.2d 1093, 1094 (3d Cir. 1972), a case upon which appellant relies, Customs Security Officers Fromkin and DeAlfi did not approach Oates and Daniels with their guns already drawn"). Application of these principles to Jackson's detention demonstrates conclusively and inescapably that he was under arrest when ordered out of his car by an officer with a drawn gun. I cannot join in the majority's groundless assumption that Officer Smardz hid his gun from Jackson's view and thereby avoided making an arrest at gunpoint. The record is entirely to the contrary. Smardz admitted that with gun drawn he ordered Jackson out of his car.

I am sympathetic to the majority's solicitousness for policemen who approach a possibly dangerous suspect without probable cause to arrest him. But while officers are allowed to take certain limited steps to protect themselves from unnecessary risks, *Adams v. Williams, supra,* 407 U.S. at 148, 92 S.Ct. at 1924, this protection must be narrowly circumscribed in order to ensure that a person's right to be free from excessive police intrusion is not unduly abridged. *Id.* The drawing of a gun by the police plainly represents a substantial intrusion upon an individual's autonomy and peace of mind. Since the line between an investigative stop and an arrest is defined according to the degree of intrusiveness of the police activity, the use of a drawn gun of necessity becomes at least strongly relevant if not dispositive in determining the appropriate characterization of a detention.

The majority similarly misreads *United States v. Oates, supra.* There we did not find that the arresting officer's belief that a suspect has been arrested was irrelevant in determining whether the suspect had in fact been arrested. Rather, we addressed only the question of whether the presence of probable cause is determined at the time when an officer first decides he will arrest a suspect or at the time when he actually places the suspect under arrest. We unsurprisingly held no more than that the legitimacy of an arrest is measured from the moment of arrest rather than from the time

---

**2.** The opening of the trunk, which resulted in the discovery of the actual bank robber, is itself also not free from constitutional uncertainty. The trial court and the majority have both accepted Officer Coyle's testimony that he opened the trunk after hearing a thump. Yet two other police officers, Smardz and Croft, stated without contradiction that an order came over the radio to search the trunk. This order was plainly not supported by probable cause. To the extent that the order formed the basis for the search of the trunk, the search was unconstitutional. The admitted presence of this order places a shroud of doubt over the claim that a thump provided the initial stimulus for the search.

when the arresting officer thinks he has probable cause to make an arrest, saying:

"Appellant strenuously argues that what is of crucial importance here is the subjective intention of Agent Hammonds, reached before requesting assistance from the Customs officers but unexpressed to any of them, to arrest Daniels and Oates. Hammonds' belief, however, that he had sufficient probable cause at this point to support an arrest, even assuming arguendo that belief to be wrong, and his intention to act upon that belief, are of no consequence here. What controls here is not what Hammonds subjectively intended to do but what he did." *Id.* at 58.

Here, by contrast, Officer Smardz did not testify that he formed the intention of arresting Jackson in the future. He swore that Jackson was under arrest from the time he drew Jackson out of his car with his gun out of its holster. The *Oates* holding in no way undermines the legitimacy of Smardz's belief or judicial reliance upon it.

Improper police activities will occasionally lead to discovery of probative inculpatory evidence of crime, as happened here. But we have long recognized that such post-arrest discoveries of evidence may not be invoked to justify unconstitutional police activity. See *Wong Sun v. United States, supra,* 371 U.S. at 484, 83 S.Ct. at 415 ("That result would have the same essential vice as a proposition we have consistently rejected—that a search unlawful at its inception may be validated by what it turns up"). By deterring police misconduct, this rule serves to guard the innocent against unwarranted police intrusion as well.

No amount of legerdemain by the majority can transform what was plainly an arrest in this case into a mere investigative stop. I cannot agree with the majority that an individual who is seized at gunpoint by an officer who later testifies that he was performing an arrest, who is drawn out of and

away from his car and who is then surrounded by up to 10 police cars and 25 police officers and subjected to a warrantless search of interior sections of his car that are not in plain view, all before probable cause for a search even arguably arises, has experienced only "a brief stop . . . in order to determine his identity or to maintain the status quo momentarily." *Adams v. Williams, supra,* 407 U.S. at 146, 92 S.Ct. at 1923; see also *Henry v. United States,* 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). Proper adherence to the principles of restraint enunciated in *Terry v. Ohio* and *Adams v. Williams* and in many cases thereafter mandates reversal here.[3]

---

3. The government has apparently conceded that if the arrest was illegal its illegality fatally tainted Jackson's confession. I therefore need not resolve whether I consider such a result

mandated under the facts of this case by the Supreme Court's ruling in *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).