UNITED STATES of America, Appellee,

v.

John Albert DANIELSON, Appellant.

UNITED STATES of America, Appellee,

v.

John Richard SKOWRONEK, Appellant.

Nos. 83–1459, 83–1460.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 13, 1983.

Decided March 6, 1984.

Rehearing and Rehearing En Banc Denied May 8, 1984.

Woods, Fuller, Shultz & Smith, P.C. and William P. Fuller, Thomas H. Muilenburg, Sioux Falls, S.D., for appellants.

Philip N. Hogen, U.S. Atty., Bonnie P. Ulrich, Asst. U.S. Atty., Sioux Falls, S.D., for appellee.

Before ROSS, McMILLIAN and BOWMAN, Circuit Judges.

ROSS, Circuit Judge.

The appellants, John Danielson and John Skowronek, were convicted on the charges of aggravated bank robbery, 18 U.S.C. § 2113(a) and (d); possession of an unregistered firearm, 26 U.S.C. § 5861(d); possession of a firearm without a serial number, 26 U.S.C. § 5861(i); and, finally, possession of a firearm by a convicted felon in violation of 18 U.S.C. app. § 1202(a)(1). The case was tried to a jury in the United States District Court for the District of South Dakota, Southern Division.[1] The appellants were each sentenced to 25 years imprisonment on the bank robbery conviction and a total of 5 years imprisonment on the convictions for the various firearms charges. The sentences are to be served concurrently.

The appellants argue that certain evidence, seized as a result of their arrest and introduced at trial, should have been suppressed because the arrest was not supported by probable cause. We affirm the judgment of the district court.

---

1. The Honorable John B. Jones, United States District Judge, presided.

*Facts*

At approximately 2:00 p.m., November 19, 1982, a branch office of the Northwestern National Bank was robbed. The branch office is located at 41st and Marion Road in Sioux Falls, South Dakota. A description of the suspects: two males 5'10" or shorter, wearing green ski masks and possibly navy blue parkas, armed with a pistol and sawed-off shotgun and carrying a police radio scanner, was transmitted over the police radio. Immediately following this bulletin officers William Grode and James Lovro of the Sioux Falls police force, traveling in separate cruisers, took positions on Interstate Highway 29 to cover the northern escape route from the city. Officer Grode parked his cruiser about three miles from the scene of the robbery on a crossover in the median with the front end facing the lanes reserved for north bound traffic.

After receiving information provided by a citizen, Mr. Jacob Hofer, police headquarters radioed a bulletin stating that two cars might be involved in the robbery.[2] One car was described as a "1971 or 1972 green Ford," the other as a full-sized dark blue or black 1974 or 1975 Thunderbird or Mercury. In addition, one of the cars had green license plates. Shortly thereafter a green Ford with South Dakota plates (which are not green in color) was found abandoned. A bulletin was then broadcast which stated that the dark blue or black auto had the green plates.

A few minutes later, at approximately 2:30 p.m., Officer Grode observed a dark blue Mercury Cougar of "middle seventies vintage" with Iowa (green) plates proceeding northbound on Interstate 29. The automobile appeared to be occupied only by the driver, a white male. Officer Grode testified that as the car approached him at a moderate speed, the driver turned and moved his lips as though speaking to the passenger window.

Officer Grode decided to follow the automobile. He passed Officer Lovro's cruiser which was parked on the shoulder of the northbound lane. Officer Grode radioed Officer Lovro and asked him if he had seen the automobile he was following and whether in Officer Lovro's opinion it matched the description put out over the radio. Officer Lovro replied that it was close and should be checked out. Officer Lovro then pulled out and followed Officer Grode.

The suspect's vehicle traveled north until it reached the Renner Road exit where it turned east. After traveling a short distance it turned (south) into an area described as an industrial complex. At this point Officer Grode advised radio communications that he would attempt to stop the vehicle before it could enter an area with buildings and warehouses. He then turned on his cruiser's red lights.

Immediately after the red lights were activated but just before the car came to a halt, a second person sat up in the right front seat of the suspect's automobile. Officer Grode stopped and got out of the cruiser with his revolver drawn. Officer Lovro had also stopped and exited his cruiser at this point. He was armed with a police riot gun. Officer Grode ordered the suspects to remain still and approached the automobile from the rear. While moving along the side of the suspect's car he heard a police radio scanner and saw two bundles of currency and some green knit material of the type used for ski masks in an unzipped backpack. The suspects were ordered out of the car, searched, and formally placed under arrest. A search warrant for the Cougar was subsequently issued and executed. The trunk of the automobile con-

---

**2.** Jacob Hofer manages a motel three blocks from the branch bank on Marion Road. Shortly after the robbery he went to the bank to transact some business and, finding it closed, he related the following to the police: About 1:30 p.m. he saw two automobiles (as described infra) making a U-turn in a parking lot adjacent to the motel. Approximately five minutes later the automobiles pulled into the motel parking lot, and a white male jumped into the green Ford which then drove off. Mr. Hofer, on his return from the bank, discovered the green Ford abandoned in the motel parking lot and called the police with this additional information.

tained a loaded pistol and sawed-off shotgun. The currency taken from the bank was found in the automobile itself.

As an initial matter, we must decide when the arrest began. The appellants argue that the arrest began at the moment Officer Grode activated the crusier's flashing lights. The government urges us to conclude that the arrest did not begin until the appellants were ordered out of the car and formally taken into custody.

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that the fourth amendment permitted certain limited seizures of persons on less than probable cause. The essential question then before the Court in *Terry* was whether the officer's actions taken in the course of the seizure were unreasonable.

> And in determining whether the seizure and search were "unreasonable" our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.

*Id.* at 19–20, 88 S.Ct. at 1878–79.

■ Putting aside for the moment the question of whether the seizure was justified at its inception, we will concentrate on the second line of inquiry. The determination of when an investigatory stop crosses the boundary and becomes an arrest is of critical importance in the analysis of whether the arrest was supported by probable cause. A decision on this issue not only determines which facts are relevant in the subsequent analysis, *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964), *United States v. Matthews*, 603 F.2d 48, 51 (8th Cir.1979) (only those facts and circumstances known to the police up to the moment of the arrest are considered), but also sets the standard under which the legality of the officer's actions are judged. An investigatory stop is valid if the officer was acting on a reasonable suspicion. Reasonable suspicion is defined as a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411,

417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1980). Probable cause, by contrast, requires facts and circumstances "sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio, supra,* 379 U.S. at 91, 85 S.Ct. at 225. The more rigorous standard of probable cause is reserved for the "highly intrusive, full-scale arrest, * * *." *United States v. Wallraff,* 705 F.2d 980, 988 (8th Cir.1983).

We can at the outset be certain that the mere stop of this automobile did not rise to the level of an arrest. *United States v. Beardslee*, 609 F.2d 914, 917 (8th Cir.1979); *United States v. Stout*, 599 F.2d 866, 868 (8th Cir.1979). It is also clear, contrary to the appellants' interpretation of the law, that the officers' intentions at the time of the stop are irrelevant to this determination. *United States v. Wright*, 565 F.2d 486, 488–89 (8th Cir.1977) (all facts and circumstances known to the officer at the time the stop was actually made, and not merely those apparent at the time the intent to stop was formed, are to be judged against an objective standard). Furthermore, under the authorities cited above, the officers could approach the vehicle and the stop would not be considered an arrest.

In considering other aspects of this seizure, the Supreme Court in the plurality opinion of *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), stated the general guidelines which must govern our inquiry.

> The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive

means reasonably available to verify or dispel the officer's suspicion in a short period of time.

*Id.* 103 S.Ct. at 1325.

The duration of the seizure in this case, unlike the detention at issue in *Royer,* was quite short. Only a minute, or two at the outside, could have elapsed between the time the cars came to a halt and the appellants were formally placed under arrest. The investigative detention could not have accomplished the purpose of the stop in a shorter period of time. *Cf. Florida v. Royer, supra,* 103 S.Ct. at 1323. The officers did not seek to question the appellants in any way nor did they require or request them to move from the spot at which the stop first occurred. *Cf. Dunaway v. New York,* 442 U.S. 200, 203, 99 S.Ct. 2248, 2251, 60 L.Ed.2d 824 (1979) (where the suspect was taken into custody at his home, transported to the police station, detained, and questioned in a small interrogation room). In this case only one factor might remove the seizure from the ambit of an investigative detention; the officers approached the appellants with their weapons drawn.

Officers Grode and Lovro were of course aware of the fact that should their suspicions about the automobile be confirmed, the occupants would certainly be armed with a shotgun and pistol. Under these pressing circumstances the officers' method of investigation is akin to that upheld in the case of *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). In *Adams* a police officer, acting on a tip, approached an automobile driven by a man thought to be armed. The officer asked the suspect to get out of the car. The suspect responded by rolling down the window. The officer reached through the window and grabbed a loaded pistol which was located at the suspect's waist. The Court stated:

> Under these circumstances the policeman's action in reaching to the spot where the gun was thought to be hidden constituted a limited intrusion designed to insure his safety, and we conclude that it was reasonable.

*Id.* at 148, 92 S.Ct. at 1924.

We too conclude that under the circumstances of this case the officers acted reasonably and did not exceed the bounds of an investigative detention. The very real danger which confronted these officers as they approached the car is perhaps so apparent as to require little discussion. A serious crime had been committed by two men armed with deadly weapons. In a car fitting the description of the suspects' vehicle, and apparently occupied by one man, a second man suddenly appears at the moment it is stopped. Under these circumstances the only reasonable response the officers could take was to exercise a great degree of care, and that is in fact what they did.

Having concluded that the actions of Officers Grode and Lovro were within the scope of an investigative detention, we must decide if the initial stop of the suspects' automobile was justified. Officer Grode, at the point the automobiles came to a halt, knew the following: (1) A robbery had been committed by two white males who were armed. (2) The robbery was committed only 3 miles and 30 minutes from the time and place of the first sighting of the suspect vehicle. (3) This vehicle generally fit the description of an automobile reasonably suspected by the police of being involved in the robbery. (4) The automobile was traveling on a route and in a direction which the officers anticipated the fleeing robbers would take. (5) Though the automobile appeared to be occupied solely by the driver, a white male, Officer Grode saw him turn his head and move his lips as though speaking to a passenger. (6) Immediately after the flashing lights were turned on, a second person suddenly sat up in the front seat.

In our opinion these facts and circumstances constitute a basis for a reasonable suspicion which almost immediately crossed over the threshold into probable cause. In the case of *United States v. Collins,* 532 F.2d 79 (8th Cir.), *cert. denied,* 429 U.S. 836,

97 S.Ct. 104, 50 L.Ed.2d 102 (1976), this court upheld an initial investigatory stop of an automobile suspected of being the escape car for three bank robbers. The automobile used in the escape was described as a "light brown late model Cadillac," while the suspects were described as three negro males. The automobile stopped by the police was a "white over gold or brown 1969 Cadillac" which was occupied by one black male, the appellant Collins. *Id.* at 83. The stop took place approximately ten minutes after and three miles away from the time and place of the robbery. The police officer in *Collins* obtained consent to search the interior of the automobile. Because the search revealed no additional evidence, Collins was permitted to proceed. Almost immediately after the initial stop and subsequent release of Collins, the officer received additional information that one of the suspects was wearing a black motorcycle jacket. Collins was wearing that type of jacket. On the basis of this information the officer again stopped, and promptly arrested, Collins. This court upheld both the initial stop and subsequent arrest. *Id.* at 83–84.

In this case the automobile description is equivalent to that available in *Collins,* and the sudden and suspicious appearance of the second suspect equates favorably with the additional information that one of the robbers was wearing a black leather coat. Furthermore, the information known to Officer Grode is superior to that available in *Collins* in at least one respect as the number of suspects in the car was the same as the number of reported robbers. These arrests were preceded by an investigative stop, justified at inception and reasonable in scope, which established that a police scanner and bundles of currency were in the suspects' possession. This highly incriminating evidence, when weighed with the information available to the officers at the time the cars came to a halt, clearly established probable cause to arrest.

For the foregoing reasons we must conclude that the trial court did not clearly err when it determined that this investigative detention was made on a reasonable suspicion, and that the subsequent arrest was supported by probable cause. *United States v. McGlynn,* 671 F.2d 1140, 1143 (8th Cir.1982).

We have carefully reviewed the other issue raised by the appellants and find it to be meritless.

McMILLIAN, Circuit Judge, specially concurring.

I agree that the police officers did not have probable cause to arrest appellants at the time they stopped appellants' car. From the police radio broadcasts the police officers knew that the branch bank had just been robbed by two white males armed with a pistol and a shotgun, the general description of the robbers and their clothing, and the descriptions of two cars that were possibly involved in the bank robbery: a 1971 or 1972 green Ford and a 1974 or 1975 full-sized, dark blue or black Thunderbird or Mercury. The police officers also knew that the green Ford had already been located in a parking lot and that the dark blue or black car had green license plates. These facts establish reasonable suspicion; however, nothing more than suspicion connected either the green car or the dark blue or black car with the bank robbery. None of the bank employees could describe the getaway car. Witness Hofer, the man who had seen the cars in the motel parking lot before the bank robbery and later saw the green car driving away from the bank at a normal rate of speed immediately after the robbery, could not connect the cars with the robbery. Another person did provide a more definite connection between the robbery and the *green* car because he saw the green car speeding away from the bank at the time of the robbery. However, the police officers had already stopped the car when the information provided by Fisher was broadcast over the police radio.

The crucial question thus is whether the police officers' actions can fairly be characterized as an investigatory stop which is permissible on the basis of reasonable suspicion only, *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), or as an

arrest for which the police officers lacked probable cause. The proper characterization of the police officers' actions in turn depends upon the significance we should attribute to the police officers' approach with drawn weapons under the circumstances of this case. This is a difficult question. The cases involving police officers' approaches to cars, with or without weapons, are not consistent and quite often contrary results have been reached in cases involving similar facts. *See United States v. Ceballos,* 654 F.2d 177, 181–84 (2d Cir. 1981) (reviewing cases). The present case certainly does not involve a brief and minimally intrusive encounter between the police and the subjects under investigation. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (airport investigatory stop). Here, the police officers stopped the car by flashing red lights, then approached the car with their weapons drawn and ordered appellants at gunpoint not to move. The officers did not ask appellants any questions. In my opinion this kind of action is almost indistinguishable from a traditional arrest. Nonetheless, I agree that the police officers' use of force (approaching the car with drawn weapons) was reasonably predicated upon the specific facts known to the police officers and which warranted such precautions: the occupants of the car were suspected armed bank robbers. *See United States v. Jackson,* 652 F.2d 244, 249 (2d Cir.) (gun drawn when approaching armed bank robber), *cert. denied,* 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981); *United States v. Coades,* 549 F.2d 1303, 1305 (9th Cir.1977) (armed attempted bank robbers; shots had been fired); *United States v. Diggs,* 522 F.2d 1310, 1314 (D.C.Cir.1975) (armed bank robbers), *cert. denied,* 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976). *See also* Model Code of Pre-Arraignment Procedure § 110.-2(3) (Proposed Official Draft 1975) (officer may use such force as reasonably necessary, short of deadly force, to stop any person or vehicle); 3 W. LaFave, Search and Seizure § 9.2(d), at 30–32 (1978 & Supp.1984) (suggesting that an otherwise valid stop is not inevitably rendered unreasonable merely because the suspect's car is blockaded or when the police officers draw weapons). *But see United States v. Jackson,* 652 F.2d at 252–55 (Mansfield, J., dissenting); *United States v. Beck,* 598 F.2d 497, 501 (9th Cir.1979) (police officers force taxi off the road and surround passengers without drawing guns; arrest); *United States v. Strickler,* 490 F.2d 378, 380 (9th Cir.1974) (car surrounded by police officers; orders given at gunpoint; arrest).

Because I think that the police officers' actions, even though the use of drawn weapons was involved, can be fairly characterized as an investigatory stop which was based upon reasonable suspicion of criminal activity, I concur.