

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-9-2003

# USA v. Gardner

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-3095

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Gardner" (2003). *2003 Decisions.* Paper 380.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/380

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-3095
_____

UNITED STATES OF AMERICA

v.

ISAAC GARDNER
a/k/a
RONALD SMITH
Isaac Gardner, <u>Appellant</u>

_____

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 01-cr-610-01)
District Judge: Honorable Clarence Newcomer
_____

Submitted Under Third Circuit LAR 34.1(a)
June 23, 2003
Before: SLOVITER, AMBRO, BECKER,
<u>Circuit Judges</u>.

(Filed July 9, 2003 )

_____

OPINION
_____

BECKER, <u>Circuit Judge</u>.

Issac Gardner was charged in a single-count indictment with being a felon in possession

of a firearm, in violation of 18 U.S.C. § 922(g)(1). After the district court denied his motion to

suppress the gun, Gardner entered a plea of guilty to the indictment, reserving his right to appeal

the adverse suppression ruling. Gardner was sentenced to 72 months imprisonment. Gardner now appeals from the District Court's order denying his motion to suppress, alleging that the *Terry* stop and subsequent frisk do not pass muster under the Fourth Amendment. We disagree, hence we will affirm. We have jurisdiction pursuant to 28 U.S.C. § 1291.

**I.**

During the late evening hours of September 7, 2000, the Quick Six tavern was robbed by a lone gunman. Shortly before 10:58 pm, a woman called 911 to report that the tavern was just robbed. Less than two minutes later, based on the woman's description of the gunman, a police radio dispatcher alerted all patrol cars in the district about a "robbery in progress, point of gun, committed by a black male, white T-shirt, blue jeans, 6 foot high." Officer Gerard Attewell arrived at the bar almost immediately and gathered additional details about the incident from the victim, a barmaid. Officer Attewell confirmed and updated the information. The updated bulletin was broadcast over police radio, stating that the perpetrator of the robbery was "a black male, six foot in height, with an Afro, wearing a white T-shirt that had a black label on the back, and dark or blue jeans ... last seen on foot."

Less than ten minutes after the robbery, and fewer than four blocks away from the scene of the crime, Officer Jose Silva, who was responding to the call, passed an automobile that was traveling away from the bar in a suspiciously slow manner. He saw that the vehicle contained three black males. It appeared to Silva that the passenger in the front right seat of the automobile fit the description reported on the police radio. Officer Silva described the front seat passenger as a black male wearing a white T-shirt who appeared to have an afro-like hairdo and, based on his height while seated in the car, appeared to be tall in stature. Silva decided to stop the car and

2

investigate, thinking that the robber, who was on foot according to the bulletin, could have gotten into a vehicle.

While Officer Silva awaited backup, he noticed that the passenger sitting on the rear seat leaned down as if to place something on the floor. Once backup arrived, Silva approached the car with a flashlight. He saw the butt of a handgun protruding from underneath the front seat. All of the occupants of the car were asked to step out and were frisked. Gardner, who had been sitting in the front passenger seat, was wearing a blue flannel shirt, a white T-shirt, blue jeans and black boots. A handgun was found in his waistband. Gardner was indicted for being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1).

## II.

This court exercises plenary review of a district court's determination of whether police had reasonable suspicion to conduct a *Terry* stop. *See Ornelas v. United* States, 517 U.S. 690, 699-700 (1996); *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000).

Under *Terry v. Ohio*, 392 U.S. 1 (1968) "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed... he is entitled for the protection of himself and others to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Id.* at 30. Therefore, in determining whether the police had a basis for conducting a *Terry* stop, two matters must be considered: first, whether the police officer had reasonable suspicion to justify the initial stop; and second, whether the officer had reasonable suspicion that the person detained was armed and dangerous.

A. The Investigative Stop

Under *Terry*, a police officer "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22. Therefore, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that 'criminal activity may be afoot.'" *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), quoting *Terry*, 392 U.S. at 30.

We agree with the district court's conclusion that Officer Silva witnessed sufficient conduct giving rise to a reasonable suspicion of criminal wrongdoing. After hearing the flash bulletin information about the armed robbery, Officer Silva decided to drive toward the crime location while surveying for the individual. Less than 10 minutes after the crime, and a few blocks away from the bar, Silva's attention was diverted when he saw a car traveling in the opposite direction in a suspiciously slow manner. Officer Silva testified that as he passed the car that he was observing, he saw a black male, wearing a white T-shirt who appeared to have an afro-like hairdo and, based on his height while seated in the car, appeared to be tall in stature. Given the proximity in space and time to the scene of the crime, the similarity to the description broadcast and the suspicious way in which the vehicle was traveling, we conclude that Officer Silva had a particular and objective basis for believing that criminal activity was afoot.

Gardner argues that Officer Silva could not have seen his white T-shirt, since he was wearing a blue flannel shirt over it. The driver of the vehicle, Jackson, testified that the defendant wore a flannel blue shirt over his white T-shirt the night they were stopped. However, the District Court did not find Jackson's testimony credible. And, while Agent Wilson testified that Gardner

4

was wearing the blue flannel shirt when he was removed from the vehicle, the court found that the defendant could have put on the blue flannel shirt while Officer Silva waited for backup. The District Court concluded that no evidence was offered to call into question Officer Silva's testimony. The District Court's finding was not clearly erroneous, hence we will not disturb it.

Gardner also argues that Officer Silva's conclusion that the robber could have gotten into a vehicle is only conjecture, and that any attempt to justify the *Terry* stop would elevate speculation and conjecture to the level of articulable facts. We disagree. The Supreme Court has said that "we cannot demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based in common sense judgments and inferences about human behavior." *Id.* at 125. When making reasonable-suspicion determinations courts "must look at the 'totality of the circumstances.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002). In addition, "[d]eference... is to given to the officer's conclusions based on the officer's experience." *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998).

In *United States v. Jackson*, 652 F.2d 244 (2d Cir. 1981), witnesses reported that a bank robber had fled on foot. Two detectives, who were driving around in search of the suspect, saw an automobile driven by a person that seemed to match the description of the suspect. The detectives thought that the driver was acting suspiciously by deliberately ignoring the commotion caused by the police cars near the bank. The car was eventually stopped. Once the driver was observed in full, it became clear that he did not match the description. Further investigation, however, disclosed the suspect hiding in the trunk of the car. The Second Circuit found that "[a]ll the factors created a reasonable suspicion that the driver was linked to the robbery. . . . Thus, it was entirely appropriate for the Dodge to be pulled over for an investigation." *Id.* at 249 (note

5

omitted).

Similarly, in this case Officer Silva reasonably believed that the defendant fit the description of the robber. Furthermore, the vehicle was near the scene of the crime minutes after it occurred. And finally, the car was traveling at a suspiciously low speed. Consistent with *Jackson*, we hold that these facts created a reasonable suspicion that the defendant was involved in the robbery, making the stop of the vehicle reasonable under *Terry*.

2. The Protective Search

In *Terry,* the Supreme Court recognized that in light of the "need for law enforcement officers to protect themselves and other prospective victims of violence," an officer is allowed to conduct a limited search for weapons. *Terry*, 392 U.S. at 24. The court stated that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* Therefore, "an officer is allowed to conduct a reasonable search for weapons, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Id.* at 27.

On these facts, Officer Silva was justified in believing that the occupants of the car were armed and presently dangerous. First, he was possibly dealing with an armed robber. Second, he had seen the passenger in the back of the car make suspicious movements. Most importantly, when he initially approached the car he noticed the butt of a handgun on the floor of the back seat. All of these facts would undoubtedly justify a reasonable prudent person to believe that his

6

safety or that of others was in danger.

The order of the District Court will be affirmed.

TO THE CLERK:

Please file the foregoing Opinion.

BY THE COURT:


 /s/ Edward R. Becker
Circuit Judge